**TEXACO, INC., Plaintiff,**

v.

**PENNZOIL COMPANY, Defendant.**

**No. 85 Civ. 9640–CLB.**

United States District Court,
S.D. New York.

Jan. 10, 1986.

Paul J. Curran, Ira A. Sacks, Kaye Scholer, Fierman, Hays & Handler, David Boies, Max R. Shulman, Frank Barron, Cravath,

Swaine & Moore, New York City, for plaintiff.

Arthur Liman, Mark Belnick, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, John L. Jeffers, Jr., G. Irvin Terrell, Baker & Botts, Houston, Tex., for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By a motion, pursuant to an Order to Show Cause, issued by this Court on December 17, 1985 and heard on January 9, 1986, plaintiff ("Texaco") seeks a provisional remedy in the nature of a preliminary injunction pending trial of the issues raised in its amended complaint, as follows: That defendant ("Pennzoil"), its employees, agents, attorneys and servants be jointly and severally enjoined and restrained from taking any action of any kind whatsoever to enforce or attempt to enforce the Judgment entered in an action in the District Court for the 151st Judicial District of Texas entitled *Pennzoil Company v. Texaco Inc.*, (hereinafter "the Judgment") including, without limitation, attempting to obtain or file any judgment, lien or abstract of judgment related to the Judgment (pursuant to Tex.Prop.Code Ann. ¶¶ 52.001, *et seq.*, or otherwise), or initiating or commencing any steps to execute on the Judgment.

This Court issued a temporary restraining order to this effect on December 17, 1985 and extended it on consent of the parties by an order dated December 23, 1985. Following the hearing, that order remains in effect by oral direction of the Court.

Pennzoil, by a cross motion filed on December 20, 1985, also heard January 9, 1986, seeks to dissolve this Court's temporary restraining order and to dismiss plaintiff's amended complaint for failure to state a claim upon which relief can be granted and for want of subject matter jurisdiction.

Familiarity of the reader with the amended complaint filed December 13, 1985 must be assumed. In sum, Texaco's complaint pleads the following claims:

1. That the Judgment and the legal principles underlying it impermissibly burden interstate commerce by deterring competitive tender offers and therefore violate the Commerce Clause and frustrate the purposes of the Williams Act. (Claims One and Two).

2. That the Judgment conflicts with, and therefore is preempted by, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(d), 78n(e) and 78bb, which promotes and provides a framework for competing tender offers. (Claim Four).

3. That the Judgment fundamentally changes the New York law of tortious inducement of breach of contract, in derogation of fundamental New York policies and in violation of the Full Faith and Credit Clause. (Claim Five).

4. That application of the supersedeas bond and lien provisions of Texas law effectively precludes Texaco from exercising its right to appeal in the Texas courts and, if necessary, to petition for *certiorari* to the United States Supreme Court, all in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. (Claims Three and Six).

5. That the Judgment, as the result of a fundamentally unfair proceeding, violates the Due Process Clause of the Fourteenth Amendment. (Claim Seven).

The Court makes the following findings of fact and conclusions of law after a hearing, and pursuant to Rule 65, F.R.Civ.P.[1]

*Jurisdiction*

■ The amended complaint filed in this Court on December 13, 1985 alleges that the enforcement of the Texas state court judgment will infringe rights secured to Texaco by the Commerce, Supremacy and

---

1. Both parties waived the taking of sworn oral testimony before the Court and the cross examination of affiants. *See* Transcript of January 9, 1986 at p. 3. No credibility issues are present which are relevant to the issues resolved by this decision.

Full Faith and Credit Clauses of the United States Constitution, Articles I, section 8, Article VI, Clause 2, and Article IV, section 1, clause 1, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution and by the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Securities Exchange Act of 1934, 15 U.S.C. § 78a. As such, this complaint has plainly stated federal claims over which this court has subject matter jurisdiction under 28 U.S.C. §§ 1331(a) and 1343(a)(3). *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

Venue is proper in this District under all three grounds of 28 U.S.C. § 1391. The plaintiff has its principal office at White Plains, New York, and defendant does business in the Southern District of New York. The claims arose in this District. Personal jurisdiction over the defendant is satisfied by its presence in this District.

### Second Circuit Injunction Standard

On a motion for a preliminary injunction in this Court, it is usually held that "the moving party has the burden of establishing: (a) irreparable harm; and (b) either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief." *Kaplan v. Board of Education of the City School District of the City of New York,* 759 F.2d 256, 259 (2d Cir.1985) *citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

The mere fact that this case involves only private parties does not permit our inquiry with regard to irreparable harm to end with consideration only of the interests of Texaco and Pennzoil as parties before the Court. As our Court of Appeals, and the Supreme Court, have explained, "Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Stamicarbon, N.V. v. American Cyanamid Co.,* 506 F.2d 532 (2d Cir.1974), *quoting Virginian Railway Co. v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937).[2]

### Irreparable Harm

██ Texaco is a very large corporation. It is said to be the fifth largest company in the United States and the third largest oil company. As such it has well established patterns of doing business, which have created a dependency upon it by not only a large number of employees throughout the nation, but also an even greater number of dealers and customers for its products and services, and suppliers. As the numerous letters from Congressmen and Senators docketed in this action and *amicus curiae* briefs from several states indicate, Texaco's death or insolvency would have a severe impact upon many people and regions throughout the country. In California, for example, Texaco employs over 4000 people (with aggregate annual salaries and wages in excess of $140 million) and conducts business with 16,000 suppliers. *See* letter of Rep. Glenn Anderson, M.C., dated Dec. 18, 1985. In Florida, Texaco pays approximately $6.7 million annually in state royalties and taxes. Brief of State of Florida, *amicus curiae,* at 2. Texaco contracts with over 4000 vendors in Louisiana and, during 1985, it expended over $1.4 billion in that state. *See* Letter of Louisiana Congressional delegation, dated December 16, 1985. Texaco employs about 55,000 people worldwide with a total payroll of $1.6 billion. In 1985 Texaco paid over $730 million in dividends to 319,000 shareholders. Affidavit of R.G. Brinkman, ¶ 3, (Dec. 17, 1985).

The sudden death or dismemberment of a corporation, while it is not analogous to the sudden death of an individual, hurts the

---

**2.** The public interest in this proceeding is considerable. This Court has received a significant number of letters in the nature of *amicus curiae.* Among these eighteen letters, mostly from Senators and Congressmen, sixteen of them have directed this Court's attention to the economic importance of Texaco in various regions of the country. Four states (Wyoming, Oklahoma, Kansas and Florida) submitted formal *amicus curiae* briefs.

public interest. This corporation should not be squeezed through the bankruptcy court or stopped in its tracks through a levy of execution or sale of its various assets under judgment or have its normal access to credit cut off, at least until appellate finality has attached to the Judgment. Unless enforcement of the Judgment is stayed by this Court, Texaco will confront these evils. The consequent harm to Texaco will be shared by those members of the public whose welfare is dependent upon Texaco's continued existence as a vital wealth-generating economic organism. As the multitude of affidavits submitted by Texaco make clear, Texaco has found it increasingly difficult to obtain the financing necessary to conduct its ordinary business operations. *See, e.g.,* Affidavits of Mr. R.G. Brinkman, dated December 17, 1985, December 19, 1985, and January 8, 1986.

The judgment with its present interest and costs amounts to $11.12 Billion. As measured by the stock market, which is rarely far wrong in such matters, the entire going concern or net worth of Texaco before the Judgment, was valued at approximately $9.5 Billion. Various Pennzoil representatives have stated that this understates the true value of Texaco's assets. They assert that the actual value lies in the $23 to $37 Billion range. *See* Affidavit of Francis P. Barron, Esq. Exhibits 1 and 2. Even if these estimates are correct, there is no way in the world that Texaco could pay the Judgment without reorganizing or liquidating. This could only be accomplished pursuant to a consent plan or under a bankruptcy court's auspices because other creditors also have claims on Texaco's assets. Such relief does not provide an adequate remedy for Texaco. As the Supreme Court has found, the threat of bankruptcy adumbrates the irreparable harm necessary for the granting of a preliminary injunction. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975). Texaco would emerge as a fundamentally different company if it were obliged to reorganize pursuant to Chapter 11 of the Bankruptcy Code. This would be true even if the Pennzoil Judgment were later set aside.

Imposition of an injunction admittedly presents some risk of harm to Pennzoil's position. The risk of such harm, however, is slight. Indeed, Pennzoil's successful insistence upon the bond requirement might drive Texaco into Chapter 11 proceedings and leave Pennzoil with a Pyrrhic victory. A number of corporations, both large and small, have recently found that Congress has created a rather pleasant and profitable harbor of refuge in the bankruptcy court, where they may gain time and other special considerations in dealing with litigation. However, as we have explained, the availability of Chapter 11 is not an adequate remedy at law for Texaco in this case, so as to preclude injunctive relief, and bankruptcy of Texaco would have a most adverse effect on the public interest.

The imminent disruption to the national economy and to the interests of the public, supports a finding of irreparable harm, at least while the Texas judgment remains subject to appellate review. I include in the public Texaco's customers, suppliers, employees and others who would suffer from the sudden disruption in Texaco's day to day activities.

It should go without very much elaboration that Texaco itself would be irreparably damaged, and I so find. Immediate enforcement of the Judgment will further limit Texaco's ability to compete in the marketplace and to maintain its current level of business. Accordingly, I find and conclude that irreparable harm to the Public and to Texaco will occur if the Judgment is enforced in any way and to any extent prior to achieving appellate finality.

*Likelihood of Success*

This Court finds and concludes that a direct appeal from the Judgment would certainly be non-frivolous. The Court also finds that Texaco as an appellant has a substantial likelihood of success on a number of its non-federal points for appellate review in Texas or on a petition for *certio-*

*rari* to the Supreme Court of the United States.

This Court should not be regarded as attempting to sit as a final or intermediate appellate state court as to the merits of the Texas action. *Cf. Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Our only intention is to assure Texaco its constitutional right to raise claims that we view as having a good chance of success.[3] The Court bases its analysis on New York law, which the parties concede is applicable to the claim in the Texas court and with which this court is very familiar.

The Court regards the Texas litigation as relatively simple. The only difficulty it presents is that it is posited in terms of such vast amounts of money that the ordinary principles and practices which affect the bonding of judgments or supersedeas arrangements for judgments are simply not practical.

Texaco has also raised here a number of federal statutory claims, over which the Federal Courts have exclusive jurisdiction. These claims raise serious questions going to the merits of the Judgment and present generally fair grounds for litigation.

*Liability*

For our present purposes we withhold comment about the contract law issue or the factual issue of knowing and willful tortious interference. This Court assumes, solely for purposes of its analysis of the issues presented on this motion, that Pennzoil properly prevailed on those issues. The Court in Texas which let these liability issues go to the jury and denied Texaco's motions for directed verdict and judgment notwithstanding the verdict is entitled to the benefit of the presumption of regulari-

ty and the presumption of correctness on its part. We should bear in mind that the damages in the case were fixed by a trial jury, not by the court itself in Texas. They do not represent the result of fact finding by the trial judge and in any event are still amenable to correction by direct appeal, and by a motion for a new trial, filed in Texas on January 9, 1986 and not yet resolved.

*Punitive Damages*

The trial jury awarded punitive damages in the amount of $3.0 Billion. The tort of interference with contractual relations is an intentional tort. In order to obtain punitive damages in this context, Pennzoil had to prove that Texaco's conduct was not only intentional but also motivated by "actual malice or ill will." *Anthony v. George T. Bye*, 243 App.Div. 390, 277 N.Y.S. 222 (1935).

While punitive damages have become quite fashionable lately, this case essentially involves a transaction in the commercial area where reasonable persons could differ as to whether Getty was bound to a contract when Texaco acted. If there was no contract, of course there could be no tortious interference.

The standard for imposition of punitive damages in New York requires that the defendant's tortious activities be aimed at the public generally, as the New York State Court of Appeals explained in *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). Punitive damage awards are also inapplicable where the availability of such an award is not essential to induce a potential plaintiff to go to court to right a wrong that might otherwise go unremedied if the injured par-

---

**3.** In reaching this conclusion, the Court places no reliance on the allegations of judicial impropriety in Texas, except to observe that Texaco should have the right to seek review of these contentions, along with its other more persuasive appellate points, without first being dismembered. Most judges are honest and sincere, and all should be presumed to be such. Those few who are not, do not throw a case for campaign contributions publicly recorded and probably long since spent. Instead, they live in

a C.O.D. world where clandestine payments are made to a bagman. *United States v. Manton*, 107 F.2d 834, 840 (2d Cir.1939). That some judicial goodwill eventuated to the contributing lawyer we may assume. Goodwill means perhaps his brief will be accepted a day late, a golfing continuance may be granted, and his jokes may evoke more judicial laughter than they otherwise deserve. But it is impossible for a lawyer to rub his own goodwill off onto the client, or the merits of the client's cause.

ty were limited to compensatory damages. *Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1080 (2d Cir.1977); *see also Garrity v. Lyle Stuart, Inc.,* 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976). These factors, either of which might justify the award of punitive damages, are not present in this case. Indeed, a substantial portion of the public at large, *viz.,* the public shareholders of Getty, benefited from Texaco's tortious activity, which greatly enhanced the proceeds realized for their investments.

No public policy of the State of New York is served by awarding punitive damages in this type of case, and this Court believes that a reviewing court in Texas will find that quite obvious. Furthermore, an award of punitive damages in this case is highly likely to have a negative impact on the federal policy which seeks to ensure that a company be sold via tender offer at a price that maximizes shareholder welfare. This federal policy is expressed in the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(d), 78n(e), and the rules and regulations promulgated thereunder, and is well pleaded in the amended complaint in this case.

*Compensatory Damages*

Compensatory damages in New York are generally regarded as requiring an award of money which would make an injured party whole, or, putting it differently, those damages which are based on the benefit of the bargain. Pennzoil does not dispute that its "agreement in principle" provided for its purchase of three-sevenths of the outstanding Getty shares. It had not arranged for the purchase of oil reserves, or any other specific Getty asset. It would have had as much control over Getty's oil assets as it would have had over the cable television networks then partly owned by Getty. In arm's-length negotiations, which the Texas jury found ripened into a firm contract, and this Court assumes for its present purposes that it did in fact so ripen into a binding contract, Pennzoil agreed to pay $112.50 per share for three-sevenths of Getty's outstanding shares, for a total price of $2.6 billion. At that price the market value of Getty's shares was approximately $6.1 billion.

Within a few days, Texaco agreed to purchase all of Getty's shares at $128 per share (an increase of $15.50 per share over the Pennzoil offer). At that price the market value of the outstanding Getty shares amounted to approximately $6.9 billion. The best indication of the value of anything, including the stock of an oil company, is usually an arm's length sale between adequately informed parties, neither under any compulsion to buy or sell; indeed, that is the traditional definition of market value. In this instance, the market value of Getty's outstanding shares was approximately $6.9 Billion.

If this verdict stands, the benefit of the bargain must be assumed by mathematics to be $7.53 billion, and the market value of Getty in excess of $10 billion. Expressed differently, if the verdict is valid, the Getty interests, in their transaction with Pennzoil, agreed to sell stock for $3 billion less than its true value. Expressed in percentage terms, the Getty interests sold the stock for 75 per cent of its value. This is absurd. If the jury's determination is the true value of the transaction, the contract would have been amenable to accusations of unconscionability, or overreaching, or perhaps even fraud in the inducement, not to mention the run-of-the-mill accusations of breach of fiduciary duty so often levelled against directors and trustees.

This Court therefore believes that the compensatory damages which flow from this breach of contract, tortiously induced by Texaco, should in no event exceed $800 Million, the approximate difference between the price per share offered by Pennzoil and the price offered by Texaco for all Getty's outstanding shares. That figure assumes that Pennzoil's bargain included the ultimate opportunity to purchase or otherwise control all the Getty shares.[4]

---

4. Pennzoil's agreement in principle as announced in January 4, 1986 press releases, pro-

Pennzoil also had a duty under New York law to mitigate its damages. In the interests of brevity, and for lack of information, we do not touch on this issue, which could only serve to reduce Pennzoil's damages. The foregoing computations are presented only to demonstrate that the compensatory damages determined by the jury are too large by several orders of magnitude.

This Court accordingly finds that Texaco has a worthwhile appeal in the Texas courts, and that it is highly likely to succeed in reducing the damages to a considerable extent.[5]

### Constitutional Claims

The State of Texas is not required by the United States Constitution to give a right of appeal at all. The Texas State Courts, however, have interpreted that state's Constitution, particularly Article I, §§ 13, 19, as recognizing such a right. *Stroud v. Ward*, 36 S.W.2d 590, 591 (Tex.Civ.App. 1931) ("A dissatisfied litigant has the constitutional right to have his case reviewed by the Court of Civil Appeals").

Having once determined to grant such a valuable right, the now well-established Fourteenth Amendment jurisprudence prevents the State from conditioning the effective exercise of that right on excessively restrictive conditions. The Supreme Court has reiterated on several occasions that, "[t]he fundamental requisite of due process is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). *See Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950);

*see also Boddie v. Connecticut*, 401 U.S. 371, 379–80, 91 S.Ct. 780, 786–87, 28 L.Ed.2d 113 (1971). Although the states are not required to establish avenues of appellate review, "it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." *Williams v. Oklahoma City*, 395 U.S. 458, 459, 89 S.Ct. 1818, 1819, 23 L.Ed.2d 440 (1969) (per curiam), quoting *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

Pennzoil has cited dicta in *Lindsey v. Normet*, 405 U.S. 56, 77–79, 92 S.Ct. 862, 876–77, 31 L.Ed.2d 36 (1972), to support its claim that the Texas supersedeas bond provision is constitutional as applied to Texaco in this instance. In *Lindsey*, the Court considered a challenge to Oregon's double bond requirement for appeal in forcible entry and detainer actions. Although the Court agreed with the petitioners' claim that the double bond requirement violated the equal protection clause of the Fourteenth Amendment, it added in passing that other "reasonable procedural provisions to safeguard litigated property or to discourage patently insubstantial appeals" would not necessarily violate the equal protection clause of the Fourteenth Amendment. *Id.* at 78, 92 S.Ct. at 876 (Citations omitted). As described above, however, the challenged Texas supersedeas bond provision combined with the immediate enforcement of the Judgment would effectively bar Texaco's meritorious appeal.

While Texaco's appeal can be heard on the merits, this Court finds that there is no

---

vided that Pennzoil would purchase a total of three-sevenths of Getty's shares and that Mr. Gordon P. Getty, as Trustee of the Sarah C. Getty Trust, would acquire the Getty shares held by the J. Paul Getty Museum. The arrangement would have left Pennzoil and the Getty Trust as the sole owners of Getty shares. The agreement in principle also provided that Getty would grant to Pennzoil an option to purchase up to 8 million treasury shares of Getty at a price of $110 per share. Also, Mr. Getty and Pennzoil agreed to maintain their proportionate shares of the company. It is highly likely that if Texaco had not acted to purchase all of Getty's shares, Pennzoil might have had to purchase, at some

future time, the outstanding shares from the Getty Trust in order to effect total control over the company. Pennzoil was the logical purchaser if the Getty Trust determined to divest its shares at some future time. Accordingly, for our purposes we treat Pennzoil as having a strong likelihood of total ownership and control, although this may not be entirely accurate.

**5.** Texaco offered no proof of Pennzoil's damages. We do not understand this to be a waiver of the rule of law by which such damages are to be determined, even if Pennzoil's three experts testified to boxcar numbers.

discretion in the Texas court to grant a stay of execution pending a meritorious appeal without posting a bond (or equivalent security) in the full amount, plus two years' interest at ten per cent, plus the anticipated costs of appeal, unless Pennzoil consents. Tex.R.Civ.P. Rule 364(a), (b). In this instance, the supersedeas bond would amount to more than $12 Billion Dollars, and in addition the Judgment will be a lien on Texaco's assets wherever filed, even if bonded.

The concept of posting a bond of more than $12 Billion is just so absurd, so impractical and so expensive that it hardly bears discussion. Texaco's right to appeal the Judgment to the Texas Court of Civil Appeals and, ultimately, to the United States Supreme Court, (provided by 28 U.S.C. § 1257) without a stay of its enforcement, would be meaningless. An $11 Billion Dollar lien on Texaco's assets would paralyze that company long before the Texas litigation reaches the point where the United States Supreme Court may decide whether to grant a Texaco petition for *certiorari*, should such relief prove necessary.

The Supreme Court directed us in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) to assess the adequacy of state procedures that restrict an individual's property rights according to the following three factors: First, the nature of the private and state interests involved; second, the risk associated with erroneous deprivation of the right; and third, the extent of the administrative burden imposed upon the state by the required procedural safeguards.

In this case each of these three considerations cuts in favor of Texaco's right to a stay in order to appeal the state court verdict. The private interest and the state interests converge in this instance. Texaco's obvious interest lies in its desire to remain in business while challenging the trial outcome. The state's interest in respect for its judgments and its legal process is furthered by ensuring Texaco's right to appeal.

As explained earlier, the risk of erroneous deprivation is quite severe in this instance. We have already outlined the irreparable nature of the injuries that Texaco would suffer if it is not granted relief from the challenged Texas state procedures. *See* pages 252–53 *supra*.

The administrative burden on the State of Texas will be slight. In order to assure Texaco of its right to enjoy a non-illusory appeal of the jury verdict, it need only provide access to its Court of Civil Appeals, as it would do normally. The only difference lies in the fact that Texaco may appeal the Judgment without posting the full $12 Billion bond and without fear that Pennzoil will immediately enforce the Judgment.

Obviously recognizing the force of this argument, Pennzoil, on December 20, 1985, submitted a "stipulation" to the Texas court, a copy of which was filed as document No. 14 in this action on the same date. This document, on its face simplicity itself, is not a stipulation in the sense commonly referred to; that is to say Texaco has not agreed to it, nor has the Texas court indicated its approval. It is a unilateral paper which reads in relevant part as follows:

> "Pennzoil Company, plaintiff in this action, hereby presents the Court the following stipulation concerning the judgment the Court entered in this action on December 10, 1985:
>
> 'Pennzoil stipulates and agrees that, if Texaco seeks to supersede or stay the enforcement of this judgment and it makes provisions to secure the judgment which the Texas courts determine would meet the standards of Fed.R.Civ.P. 62, Pennzoil will be bound by any stay that the Texas courts enter based on a finding that Texaco has provided security which meets the standards of Fed.R.Civ.P. 62.'
> WHEREFORE, Pennzoil requests that the Court accept this stipulation."

The filing of this so-called "stipulation" is not available to Pennzoil to defeat the Sixth Claim pleaded in Texaco's amended complaint. The Court finds no basis in our jurisprudence by which Texaco is required

to accept this belated concession, nor is it established here that the Texas court must accept such a unilateral grant of power. It is abundantly clear on the record before me that the Texas court recognizes it has no power to give a stay pending appeal, except upon full compliance with Rule 364. This Court doubts very much that such a unilateral stipulation can give a court power to hear and decide an issue which it would not ordinarily have the power to hear and decide. I find, accordingly, that without injunctive relief from this Court Texaco will not be able to obtain a stay pending appeal without delay unless it provides security in the full amount.

Vivid evidence of this fact was demonstrated at our hearing, where it appeared that the trial judge in Texas, in order to obtain Pennzoil's "consent" to an extremely limited "standstill agreement," (see Judgment, ¶ 7, Ex. 1 to Amended Complaint) found it necessary to inform Pennzoil's counsel directly that if Pennzoil did not "consent" thereto, the court would exercise its so-called "broad discretion" to grant a new trial. It seems unlikely that a judge would find necessary such a forceful approach if, as Pennzoil now argues to this Court, there is ample basis for Texaco to get a stay equivalent to the injunctive relief it seeks from this Court by direct application to the trial judge in Texas. We need not infer that experienced participants would behave in such a bizarre fashion, as they apparently did in connection with the standstill agreement, if the judge believed he had the discretion to act pursuant to the standards of Rule 62, F.R.Civ.P., or believed that such authority could be granted to him by unilateral stipulation.

Accordingly, the Court believes that on the sixth claim pleaded in Texaco's amended complaint here, which is based on the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, plaintiff has a very clear probability of success.

*Federal Statutory Claims*

Insofar as the other claims pleaded are concerned, extended discussion at this time seems unnecessary. At the very least the Court finds that each one presents fair ground for litigation. As we noted earlier, if this judgment were enforced suddenly against Texaco, prior to having attained appellate finality, Texaco would be irreparably damaged, resulting in dismemberment and death of this economic enterprise. Accordingly, the balance of hardships on this point tips decidedly in favor of Texaco.

In litigating these federal issues in this Court, we note that Texaco would not be bound by any principles of *res judicata* or issue or claim preclusion as a result of the judgment in Texas. In a recent series of decisions in this area, the Supreme Court has clarified the application of res judicata principles in federal courts. In *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Court explained that a prior state court judgment should have the same claim preclusive effect in any federal court as it would in another court of that state. The Court based its decision on its interpretation of the Full Faith and Credit Clause of the Constitution as implemented by 28 U.S.C. § 1738. This general rule, however, is limited by the Court's later decision in *Marrese v. American Academy of Orthopaedic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). In that case, the Court held that, although the Full Faith and Credit Statute requires the federal courts to examine the preclusive effect of state judgments according to that state's claim preclusion principles, that determination was only a first step of the analysis. By way of fairly clear dictum, the Court stated that in some instances, a grant of exclusive jurisdiction to the federal courts for the protection of a particular statutory scheme may represent Congressional intent to repeal § 1738 for the purposes of that statutory scheme. The federal security law claims raised in this amended complaint may very well present an appropriate situation for an exception to § 1738 contemplated in *Marrese.*

The Judgment in Texas came out of a state tort action, arising under New York

common law. It should not have any preclusive effect in litigating the federal security law claims pleaded here which are set forth in Claim Numbers Two and Four, in this complaint, because those claims arise under statutes as to which this Court has exclusive subject matter jurisdiction. 15 U.S.C. § 78aa.

Therefore, even with the assumption that the State of Texas applies the same claim preclusion principles that New York applies (which are about as broad as can be imagined because they include everything that was pleaded or could have been pleaded), this Court finds and concludes that federal claim preclusion as most recently outlined by the Supreme Court in *Marrese* would not extend to bar the federal question claims pleaded in Claims Two and Four of the Amended Complaint.

Any provisional remedy granted by this Court is granted for the day and conditions presently before the Court, and it is not required that this Court activate its crystal ball or predict in advance how long it will take to resolve the Texas appellate proceedings, or what the final outcome will be. However, even if the Judgment ripened into a final judgment in this vast amount of money, and assuming all decisions down the road go against Texaco, Texaco would still have the federal claims that are pleaded in this action, which it could litigate on the merits.

*Federalism Concerns*

 In spite of the foregoing it has been suggested that this Court should abstain or forebear in the issuance of an injunction because to do otherwise will violate basic principles of Federalism. These principles were first codified in the Anti-Injunction Statute of 1793; its current amended version is found at 28 U.S.C. § 2283. The Supreme Court expanded these principles when it developed the doctrine of federal abstention in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) and also in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There is also present for consideration the more recently developed concept of "Our Federalism," first announced in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Section 2283 provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The Supreme Court, however, has not interpreted this prohibition as strictly as it reads. In *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the Supreme Court held that any federal statute that created "a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding," *id.* at 237, 92 S.Ct. at 2159, provided an express authorization from Congress for a suit injunction. The Court further held that because § 1983 was enacted to redress inadequate state court remedies it provided the necessary specific authorization. Each of plaintiff's federal claims is properly brought pursuant to § 1983. *See Maine v. Thiboutot*, 448 U.S. 1, 7–8, 100 S.Ct. 2502, 2505–06, 65 L.Ed.2d 555 (1980) (plaintiff may enforce federal statutory rights in a § 1983 action); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (plaintiff may enforce due process claims in a § 1983 action); and *Kennecott Corp. v. Smith*, 637 F.2d 181, 186 (6th Cir.1982) (Williams Act). *Henry v. First National Bank of Clarksdale*, 595 F.2d 292, 299 (5th Cir.1979).

The *Younger* concerns, which we must consider apart from the § 2283 analysis, similarly are not implicated here. The Supreme Court first enunciated the *Younger* doctrine to bar federal interference in pending state criminal prosecutions. Since then the doctrine has been applied to civil proceedings only where the state has demonstrated a vital concern in the unimpaired operation of its laws. *See Moore v. Sims*, 442 U.S. 415, 425, 99 S.Ct. 2371, 2378, 60 L.Ed.2d 994 (1979). Thus the Court has limited the application of the *Younger* doc-

trine to those instances where a state was engaged in directly advancing important state interests in the state courts.

Indeed in each of the cases proposed by Pennzoil, the pending state actions were akin to criminal proceedings, or were necessary to insure the proper functioning of the state judicial system, e.g., in contempt citations or lawyers disciplinary proceedings. They concerned such contexts as the enforcement of an anti-obscenity statute, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); the application of an emergency child protection statute, *Moore v. Sims, supra;* the recovery of public assistance benefits fraudulently obtained, *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); the enforcement of a civil contempt citation, *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); and the conduct of a state bar disciplinary hearing, *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

Pennzoil also relies on *Middlesex County Ethics Committee, supra* to support its abstention argument. In that case, the Supreme Court ordered the federal district court to abstain from enjoining a state bar disciplinary proceeding on the ground that the federal plaintiff would have an adequate opportunity to interpose his federal constitutional defenses in that forum. *Id.* at 437, 102 S.Ct. at 2524. No such encroachment on state proceedings would result from granting the proposed equitable relief in this case. Far from impairing the operation of the state judicial system, this relief would now facilitate presentation to the Texas state courts of Texaco's challenge to the Judgment prior to an inevitable dismemberment caused by the bond provision, which would otherwise attenuate both the appellant and the force of the appeal. The concerns of the federalism impelling the *Middlesex* decision are therefore not implicated here.

In each of the cases relied upon by Pennzoil, intervention by the federal court would have impaired seriously the pursuit of state interests. Such is not the case here. The preliminary injunction in this case will neither interfere with a state official's pursuit of a fundamental state interest nor enjoin a state proceeding. The sole purpose of this equitable relief is simply to afford Texaco an effective opportunity to initiate and complete appellate proceedings in Texas, followed by petition for *certiorari* to review in the Supreme Court without immediate enforcement of the Judgment.

The significance of the State of Texas' interest as defined by Pennzoil, *viz.*, the "proper functioning of its judicial system" does not necessarily cut in Pennzoil's favor. By its proposed "unilateral stipulation" Pennzoil purports to accord the Texas trial judge the discretion to impose security in a sum or form different from the total amount of the Judgment. Thus, Pennzoil is prepared not only to waive its right to a bond in the full amount of the Judgment plus interests and costs, but also to waive whatever important state interests underlie the procedures found in Rule 364(b). That these interests can be so easily waived by a private litigant, if they can, suggests that they are less than fundamental to the functioning of the Texas state judicial system.

Pennzoil's report that the trial judge had stated that he would grant Texaco's motion for a new trial unless Pennzoil's attorneys consented to Paragraph 7 of the Judgment (the "standstill" provision), suggests that he evidently thought that the state interest dictated some sort of relief to Texaco from the bond requirements of Rule 364. I conclude that only the most attenuated state interest is reflected in a rule which can be so waived or circumvented by a private litigant.

The *Pullman* abstention doctrine is even more restricted than the other two limitations on Federal Courts. In sum, this doctrine requires the federal court to abstain from decision where resolution of an unclear state law can avoid a substantial constitutional question. *Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). Here, the state law is clear and the Texas state court judge has proved unable

to circumvent the Draconian effect of the local law denying an unsecured stay pending appeal, without some sort of consent from Pennzoil.

Nor does the abstention doctrine embraced by the Court in *Burford, supra,* dictate that this Court stay its hand here. That case turned on the complexity of a state administrative scheme with which the state court had far greater expertise and knowledge.

Finally, we note that the imposition of this sort of injunction is hardly unique. In *Henry v. First National Bank of Clarksdale, supra,* the Court of Appeals upheld a district court order enjoining the enforcement of a final judgment against a state court defendant. In *Henry,* as in this case, the relatively large size of a damage award which was immediately enforceable against the state court defendants threatened irreparable harm to them if they attempted to post the required bond. *Henry,* 595 F.2d at 297.

Pennzoil has made an impressive effort to exsanguinate *Henry* as an available precedent for this case. *See* Pennzoil Memo at 30–33. Pennzoil argues, for example, that Texaco has not exhausted its state remedies, as the federal court plaintiffs did in *Henry.* It is well established, however, that exhaustion of state remedies is not a prerequisite to § 1983 relief in Federal Courts. *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In other instances the Supreme Court has not required that federal plaintiffs exhaust their state appeals before obtaining federal injunctive relief. *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1976) (holding that such exhaustion is not required where the injunctive relief will not "annul the results of a state trial").

Pennzoil has also suggested that *Henry* is unique because the state court judgment had imposed restraints upon a "clear federal interest," *viz.* the federal plaintiff's free exercise of their First Amendment rights. The plaintiffs in *Henry,* however, did not succeed in vindicating this "clear federal interest" until three years later, when the United States Supreme Court reversed the Mississippi State Supreme Court in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). While federal courts often declare that First Amendment rights are "special" the *Henry* Court made no attempt to limit the scope of its relief to Constitutional claims in general, or First Amendment claims in particular.

Thus, we find *Henry,* in its essential facts, indistinguishable from the instant case and embrace its analysis.

Accordingly, this Court finds there is no legal bar, and no genuine issue of disputed relevant fact that prevents granting this injunction. There is absolutely no reason in the world why it should not be granted.

*Security*

The next issue for consideration is what security should be required of Texaco pursuant to Rule 65(c), F.R.Civ.P. and as a condition for the provisional relief being granted. This Court is concerned lest other creditors of Texaco will come romping around the executive offices or run into the courts seeking to perfect security interests higher than that which would be available to Pennzoil. This would be unfair to Pennzoil, and it would also be contrary to the public interest and will have a deleterious effect on Texaco. Accordingly, the Court believes that this provisional remedy being granted here today must be secured by assets or obligations at least equal in value to what this Court regards as the maximum amount of compensatory damages which are likely to be awarded to Pennzoil on appeal or at a new trial limited to damages if such were to be granted.

This Court assumes that the price which Texaco paid for the Getty interests was an arm's length price representing the fair market value of what was acquired at the time and place it was bought and sold. Assuming that Pennzoil's claim that it had a valid contract will be upheld on appeal, since that contract price was $15.50 per share less than the price Texaco paid for

the same assets, then the benefit of the bargain lost by Pennzoil is, as observed earlier, approximately $800 Million. To this must be added an element for interest and costs and attorneys fees. The Court accordingly believes that a proper security for the provisional remedy being granted here today would be $1 Billion.

The Court will grant to Texaco a twenty (20) day period following entry of the order hereon, during which to propose and submit additional security for a preliminary injunction, beyond the sum of $1,000,000 posted to secure the Temporary Restraining Order, which shall be satisfactory to the Court, after having heard counsel for Pennzoil on that subject. Without limiting the future resolution of this matter by the Court, a letter or letters of credit, a surety bond, a deed or deeds of trust covering physical assets which are clearly of a value of that magnitude, a judgment lien, or any combination of those items, or anything else upon which the parties may agree, providing security in the amount of $1 Billion Dollars would be considered by this Court to be satisfactory. If the parties find it necessary to have a hearing as to the appropriateness of any security tendered by Texaco, that hearing may be held on 24 hours notice by application to the Deputy Clerk for an hour or date on which the Court will be available.

For the reasons set forth herein, the cross motion of defendant Pennzoil is denied.

The foregoing, together with certain formal supplemental findings of fact, to the extent that they are not inadvertently inconsistent with anything herein contained, constitutes the findings of fact and conclusions of the law of this Court pursuant to Rule 65(d), F.R.Civ.P. The Court directs that a formal order granting a preliminary injunction as requested be settled on five (5) days notice. The temporary restraining order previously granted herein is continued until such date as the formal order is actually signed and docketed.

The Court also directs that the status conference required pursuant to Rule 16, F.R.Civ.P. will be held by this Court on April 7, 1986 in Courtroom 31 at the United States Courthouse, 101 East Post Road, White Plains, New York 10601.

So Ordered.