848 F.2d 544
 128 L.R.R.M. (BNA) 2890, 57 USLW 2035,
109 Lab.Cas. P 55,908
 HOWARD GAULT CO., et al., Plaintiffs,
Texas Citrus and Vegetable Association, formerly "Texas
Citrus & Vegetable Growers and Shippers, Inc.",
Plaintiffs-Counter Defendants,
Appellants, Cross- Appellees,
v.
TEXAS RURAL LEGAL AID, INC., et al., Defendants, Cross-Appellants,
Jesus Moya, Defendant-Counter Plaintiff Appellee, Cross-Appellant.
TEXAS FARM WORKERS UNION, et al., Plaintiffs-Appellees
Cross-Appellants,
Delia Gamez-Prince, Plaintiff-Appellee, Cross-Appellant,
v.
Joe BROWN, (successor in office to Travis McPherson), et
al., Defendants- Appellants, Cross-Appellee.
 No. 85-1572.
 United States Court of Appeals,
Fifth Circuit.
 June 30, 1988.
 
 Neil Norquest, McAllen, Tex., for Texas Citrus & Vegetable Assoc. and Joe Brown Ewers & Toothaker.
 Michael E. Avakian, Terran W. Mast, North Springfield, Va., for amicus The Center on Nat. Labor Policy, Inc.
 W. Carl Jordan, Thomas H. Wilson, Houston, Tex., for amicus Assoc. of Gen. Contractors of America, Texas Chapter.
 Javier P. Guajardo, Mary F. Keller, Asst. Attys. Gen., Austin, Tex., for amicus State of Tex.
 William H. Beardall, Texas Rural Legal Aid, Inc., Farmworker Div., Weslaco, Tex., for Moya and Prince.
 Edward B. Cloutman, III, Dallas, Tex., for Texas Rural Legal Aid.
 David Van Os, Austin, Tex., for amicus Texas AFL-CIO.
 Norma Cantu, San Antonio, Tex., for amicus Mexican American Legal Defense & Educational Fund (in support of appellees Texas Rural Legal Aid).
 Peter Linzer, Univ. of Houston Law Center, Houston, Tex., for amicus Texas Civil Liberties Union.
 John Arneson, New York City, for Texas Farm Workers.
 Appeals from the United States District Court for the Northern District of Texas.
 Before BROWN, RUBIN, and HIGGINBOTHAM, Circuit Judges:
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This case comes to us on appeal from a judgment of the District Court declaring, inter alia, Texas Revised Civil Statutes (Mass Picketing Statutes) article 5154d Secs. 1(1),[1] 2[2] and 3,[3] article 5154f[4] Secs. 2(b), 2(d) and 2(e), and article 5154g Sec. 2[5] to be unconstitutional. The District Court additionally held that the civil rights of Jesus Moya were violated by individuals acting under color of state law, and awarded damages. Gault v. TRLA, 615 F.Supp. 916 (N.D.Tex.1985). In a companion case also decided today, Nash v. Chandler, 848 F.2d 567 (5th Cir. June 30, 1988), the District Court for the Eastern District of Texas likewise held Article 5154d to be unconstitutional. We affirm in part and reverse in part the decisions of the District Courts that these statutes are unconstitutional. We affirm the decision of the District Court that Moya's civil rights were violated by persons acting under color of state law. The damage award is affirmed also.
 
 
 2
 This case arose out of two separate lawsuits which were consolidated for purposes of trial. Suit no. 127 raised the civil rights claim; suit no. 129 challenged the constitutionality of the Texas Mass Picketing Statutes. For purposes of this appeal, the two suits will be treated separately. Finding no clear error, we affirm the judgment awarding Jesus Moya $500.00 for the violation of his First Amendment rights by individuals acting under color of state law. The constitutional issues require a more detailed analysis.
 
 
 3
 Article 5154d Sec. 3, which criminalizes any oral misrepresentation without any standard of fault, is unconstitutionally overbroad and cannot stand. Likewise, article 5154g Sec. 2 is clearly an unconstitutional infringement on an employee's First Amendment right of association, and we affirm this holding of the lower court. Article 5154d Sec. 1(1) and article 5154f Secs. 2(d) and 2(e) unconstitutionally infringe on protected rights and interests. Article 5154f Sec. 2(b) and article 5154d Sec. 2 have been interpreted in such a way as to render them constitutional.
 
 The Onion Field
 
 4
 This case grew out of an attempt by the Texas Farm Workers Union (TFWU) to organize onion harvest and packing shed workers at the Hereford, Deaf Smith County, Texas onion fields. Delia Gamez-Prince, Jesus Moya and others acting for TFWU began establishing picket lines around certain onion fields in the area. At the height of the strike, several hundred demonstrators were on the picket lines.
 
 
 5
 Texas Rural Legal Aid, Inc. (TRLA) is a federally funded legal aid organization with an office in Hereford. Several TRLA attorneys were at the picket lines on numerous occasions to render legal advice. The TRLA attorneys informed the workers of their rights and were present to mediate between the workers and the growers.
 
 
 6
 Seventeen growers, packers, and trade associations, determined to put a stop to the picketing, filed suit in Texas state court against the TRLA, the TFWU, individual TRLA attorneys who had been at the picket lines, and Jesus Moya. The suit alleged that numerous violations of Texas picketing statutes had been committed, including conspiracy to trespass, to block entrances, to use obscenity and to engage in illegal mass picketing. The suit also alleged that TRLA violated the provisions of the Legal Services Corporation Act by improperly spending federal money to support union organizing activities.
 
 
 7
 The attorneys who represented the growers, Roland Saul, Jerry Smith and Don Davis, were also employed by Deaf Smith County as Criminal District Attorneys. While preparing the growers' state court petition, these attorneys contacted the Texas Attorney General's office to discuss the constitutionality and enforceability of the Mass Picketing Statutes. At trial, the growers' lead counsel testified that he sought relief under these statutes because of advice given by the Attorney General's office.[6]
 
 
 8
 The picketing statutes authorize county or district attorneys to institute suits for injunctive relief for picketing violations.[7] Conduct which would give rise to a criminal prosecution could thus easily be the subject of a civil lawsuit. In their official capacity, Saul, Smith, and Davis were vested with the authority to bring a criminal prosecution in the name of the State. As private attorneys, they were engaged to protect the interests of the growers. Throughout this litigation, all three attorneys appeared to view the picketing activities from both sides of the fence: as civil attorneys and as criminal prosecutors.
 
 Straddling the Legal Fence
 
 9
 Attorney Saul interviewed several deputy sheriffs about the situation on the picket lines, and at trial admitted his interest encompassed both the civil and criminal aspects. Affidavits obtained by Saul from two of the deputies were used to support the issuance of the TRO. Attorney Davis met with deputies during the strike to explain the trespass and picketing laws. An investigator employed by the Criminal District Attorney's Office viewed the picket lines during working hours and reported his observations to Saul.[8] The District Court noted the interesting fact that the attorneys could bill the growers for a private lawsuit, while they would receive only their salary in a criminal prosecution.[9]
 
 
 10
 The Attorney General of the State of Texas is authorized to advise district and county attorneys, but is expressly prohibited from giving advice to private civil counsel.[10] For this reason, the District Court concluded that the consultation between the growers' counsel and the Attorney General's office could only have been in counsel's official capacity as a criminal district attorney.[11]
 
 Case No. 2-80-127
 The TRO and Civil Rights Claim
 
 11
 The growers filed suit in Texas state court on June 30, 1980, and a temporary restraining order was granted. The case was removed that same day by TRLA to federal District Court, where the TRO expired by its own terms on July 10, 1980. The TRO restrained the defendants (i) from placing more than two pickets within fifty feet of any entrance to the picketed premises or within fifty feet of any other picket;[12] (ii) from obstructing any entrance to any premises being picketed;[13] (iii) from using insulting, threatening or obscene language to interfere with or intimidate another worker;[14] (iv) from picketing which included slander, libel or publication of oral or written misrepresentations;[15] (v) from aiding or abetting any secondary picketing;[16] (vi) from establishing or aiding a secondary boycott;[17] and (vii) from establishing or aiding any strike or picketing which urged, forced or coerced an employer to bargain with a minority union.[18] The TRLA was also restrained from encouraging others to engage in any picketing, boycott, or strike, or from engaging in it themselves.[19]
 
 
 12
 At no time was anyone arrested or threatened with arrest for picketing activities.[20] Law enforcement officials were present, but their only contact with the demonstrators was to warn them to refrain from blocking traffic or entrances, or from committing trespass. The sheriff of Deaf Smith County viewed much of the picketing activity, but saw no violence, no blocking of entrances, and no commission of any otherwise unlawful acts.
 
 
 13
 The sheriff and his deputies videotaped the picketing, using equipment borrowed from the growers. When the equipment broke down, the deputies were instructed to continue pointing the broken camera at the picketers, apparently for purposes of harassment. The sheriff himself recorded license plate numbers of all individuals entering and leaving the law offices of Texas Rural Legal Aid, Inc., regardless of whether they were suspected of any criminal activity other than picketing.
 
 
 14
 Following the issuance of the TRO the picket line dropped from approximately 200 workers to between 20 and 30 workers. Almost immediately picketers began to return to work. On July 21, 1980, the TFWU and Jesus Moya filed a counterclaim in federal court alleging violations of several federal statutes, including 42 U.S.C. Sec. 1983.
 
 Case No. 2-80-129
 The Constitutional Challenge
 
 15
 On July 1, 1980, TFWU, TRLA and others filed a separate complaint seeking a declaratory judgment that certain Texas statutes were unconstitutional and injunctive relief against their enforcement. The suit alleged the enforcement of the statutes unconstitutionally infringed on their First Amendment rights. This second suit named state officials as defendants, including (i) the sheriffs of Deaf Smith and surrounding counties, (ii) the director of the Texas Department of Public Safety in his official capacity, (iii) Roland Saul, in his capacity as the Criminal District Attorney for Deaf Smith County, and (iv) Jerry Smith and Don Davis, in their capacity as assistant criminal district attorneys for Deaf Smith County. Delia Gamez-Prince, a farm worker and TFWU member, was later added as plaintiff and the Attorney General for the State of Texas was added as a defendant. The claims against the sheriffs of the other counties were dismissed along with the claims against the Director of the Department of Public Safety. At trial, the only remaining defendants were the Deaf Smith County Sheriff, the three criminal district attorneys and the Attorney General.
 
 
 16
 Moya's civil rights claims (case 127) are based on allegations that the growers, acting under color of state law by acting in concert with state officials, conspired to file the TRO lawsuit maliciously and without according Moya due process of law. The filing of the lawsuit came under the state law umbrella because relief was sought under the provisions of the Mass Picketing Statutes. Moya claimed that the conspiracy was formed with the purpose and intent of denying him, members of the TFWU and other Mexican-American farm workers their rights to freedom of speech and assembly, their right to organize and their right to due process. Finally, Moya alleged a conspiracy among the Deaf Smith County Criminal District Attorney's Office, the growers and the state court judge, all of whom were acting under color of state law, to obtain the TRO in "bad faith" and with "malicious abuse of process," knowing there was no possibility of success on the merits and with an awareness that some of their claims for relief were based upon unconstitutional provisions of article 5154d et seq.
 
 The Final Posture
 
 17
 The two cases were consolidated for trial on April 6, 1983. TRLA, acting as counsel for TFWU, stated that no evidence would be presented or relief sought on behalf of TFWU. Accordingly, all causes of action brought by TFWU were dismissed. This left Jesus Moya as the only claimant for relief in the original action (No. 127) filed by the growers; TRLA and Delia Gamez-Prince were the only claimants in the second suit (No. 129) for declaratory and injunctive relief.
 
 The Workers Reap a Harvest
 
 18
 Following a bench trial, the District Judge held that (i) the growers, by reason of their interaction with the District Attorneys, the Attorney General's Office, the Sheriff's Department and others, acted under color of state law; (ii) the growers deprived Moya of his rights under the First Amendment, but he suffered no other constitutional deprivation; (iii) the growers were not entitled to the presumption that a private party who invokes a presumptively valid state statute is entitled to a good faith immunity from monetary liability under Sec. 1983; (iv) there was no good faith immunity because the unconstitutionality of article 5154f, relied upon by the growers in obtaining the TRO, had been clearly established by the Texas Supreme Court in International Union of Operating Engineers v. Cox, 148 Tex. 42, 219 S.W.2d 787 (1949) and Construction and General Labor Union v. Stephenson, 148 Tex. 434, 225 S.W.2d 958 (1950); (v) Moya was entitled to $500.00 in compensatory damages from the growers for the violation of his constitutional rights; (vi) Gamez-Prince had standing to raise the constitutional claims in the second suit, but TRLA did not; and finally (vii) seven Texas statutes[21] were unconstitutionally overbroad.
 
 All Are Unhappy
 
 19
 On appeal, the remaining parties and amici raise numerous issues.
 
 No. 127
 
 20
 In this case, the growers challenge the rulings that they were acting under color of state law, and that they were not entitled to good faith immunity. The growers also object to the determination that Moya's First Amendment rights were violated. Moya seeks a new trial on the issue of damages, urging that $500.00 is inadequate compensation for the injuries he suffered.
 
 No. 129
 
 21
 In this case, the first issue involves whether Delia Gamez-Prince and TRLA had standing to challenge the statutes in question. The second involves whether the District Court should have abstained from ruling on the constitutional issues in light of the lack of established state court precedent interpreting those statutes. Finally, if the second question is answered in the negative, whether the District Court correctly determined these statutes to be unconstitutional.I. Under Color of State Law
 
 
 22
 Recovery under Sec. 1983 is predicated upon a showing that the growers acted under color of state law and that their actions caused the deprivation of a right secured by the Constitution and laws of the United States.[22] Moya claims that the growers, acting in concert with state officials, maliciously filed suit against him in violation of his First Amendment rights.
 
 
 23
 A. Is Filing Suit "Color of State Law"?
 
 
 24
 The first inquiry is whether the growers, as private litigants, acted under color of state law. The lower court concluded that they did. By acting together with various state officials, who must have been acting in their official capacities, and in obtaining significant aid therefrom, the growers acted under color of state law.[23]
 
 
 25
 It cannot be disputed that Saul, Smith, and Davis were attempting to tread a very thin line between their official duties and their representation of their private clients.[24] After the issuance of the TRO, the three attorneys continued to advise the deputies on the provisions of the TRO and the 50-foot spacing rule. At the very least, this presents a severe conflict of interest. At the worst, the growers' interlocking relationships with their attorneys, the county sheriff and the State Attorney General was sufficient to characterize the growers as state actors.
 
 
 26
 The growers are purely private individuals. The attorneys they hired operated in dual capacities. In accepting employment to institute the civil lawsuit, they acted as private attorneys. Much of the investigatory work which culminated in this lawsuit was accomplished under the auspices of the Criminal District Attorney's office. The attorneys sought and received aid in their representation of the growers from the county sheriff and State Attorney General.
 
 
 27
 State action can manifest itself in a variety of ways and certain actions may not fit neatly into a particular category.[25] This is a case where the activity simply does not fit squarely within any of the previously drawn categories. For a nominally private individual's conduct to meet the state action requirement, there must be such a sufficiently close relationship between the actor and the state that the actor can fairly be viewed as an agent of the state.[26] This is a factual matter which should not be set aside unless clearly erroneous.[27]
 
 
 28
 We cannot say, after weighing all the facts and circumstances, that the trial court was in error. The hostility of the community toward the union organizers was evident. The growers were not the only ones determined to rid the county of "troublemakers." The sheriff gave a speech to a convention of vegetable growers in which he referred to the organizers as operating in a "terrorist" manner and preaching communism and socialism. The sheriff and the growers were clearly acting in concert when the growers donated videotape equipment to enable the sheriff to film the protests. The attorneys for the growers continued throughout the litigation to advise the sheriff and his deputies as well as the growers. We do not dispute the conclusion that the growers were state actors.
 
 
 29
 In the wake of the Supreme Court's decision in Pennzoil v. Texaco,[28] we are concerned that our holding be construed as narrowly as possible. Pennzoil provides the most recent pronouncement on the definition of "state action" for purposes of Sec. 1983 and provides additional support for the District Court's conclusion that the growers acted under color of state law in obtaining the TRO. Nevertheless, Pennzoil reaches beyond the confines of this case, and we hesitate to rush in where half of the Supreme Court feared to tread.
 
 
 30
 Pennzoil was an action originally brought in a Texas state court as a wrongful interference with contract claim under state law. Pennzoil prevailed on the merits and obtained judgment for approximately $11 billion, including prejudgment interest. Under Texas law, once the judgment was finalized, Pennzoil would have significant rights against Texaco, including the right to secure a lien against Texaco's real property located in any county in which the judgment was recorded,[29] and to execute the judgment by securing a writ of execution from the clerk of the court that issued the judgment.[30] A judgment debtor can suspend the execution of the judgment by filing a supersedeas bond,[31] in the full amount of the judgment, plus interest and costs.[32] In order to take a supersedeas appeal, Texaco would have been required to post a bond of approximately $13 billion.
 
 
 31
 Texaco filed suit in federal court under 42 U.S.C. Sec. 1983 seeking injunctive relief to avoid the bond and lien provisions of Texas law.[33] Although Justice Powell's opinion for the Court did not reach the merits of Texaco's Sec. 1983 claim,[34] four of the nine justices specifically stated that "a creditor's invocation of a state's postjudgment collection procedures constitutes action 'under color of' state law within the meaning of 42 U.S.C. Sec. 1983...."[35]
 
 
 32
 The Second Circuit's Pennzoil opinion held, in a finding expressly approved by Justices Brennan, Stevens, Marshall and Blackmun, that action taken by a judgment creditor to enforce a judgment, in accordance with provisions of state law, would be action taken under color of state law.[36] The enforcing of a judgment was distinguished from action taken by a private party who merely brought suit seeking a judicial determination,[37] or the simple seeking and obtaining of a temporary restraining order,[38] or even the action of a private party who misused a lawful state procedure with inadvertent assistance from a state court judge.[39] In the last three situations, an independent evaluation by the judiciary had taken place. It could not be said that the private litigant was acting "under color of state law," nor could such a litigant be charged with responsibility for an independent judicial decision.[40] Pennzoil's action[41] in enforcing the judgment was different from these other cases because it was solely the decision of Pennzoil, not that of any state official, to determine whether to execute the judgment. Once Pennzoil made that unilateral determination, state officials were compelled to undertake the collection process.[42]
 
 
 33
 We wish to emphasize that this case is one of first impression in this circuit and is not precisely on all fours with Pennzoil. We feel compelled to engage in an independent analysis of the issue, beginning with Lugar v. Edmondson Oil Co.[43]
 
 
 34
 In Lugar, a creditor filed suit on a debt in state court. Pursuant to state law, the creditor additionally sought a prejudgment attachment of the debtor's property. The attachment procedure required only that the creditor allege, in an ex parte petition, the belief that the debtor was disposing of, or might dispose of, the property in order to defeat the creditor's claim. Acting upon the petition, a clerk of court issued a writ of attachment which was executed by the county sheriff, effectively sequestering the property. The statute provided for a post-attachment hearing, and the writ was eventually dissolved because of the creditor's failure to establish the statutory grounds alleged in the petition.[44]
 
 
 35
 Lugar delineates a two-part test for determining whether state action exists.[45] The first inquiry is whether the claimed deprivation has resulted from "the exercise of a right or privilege having its source in state authority." The second is whether, under the facts of the instant case, the private party may fairly be characterized as a "state actor."[46] In Lugar, both questions were answered in the affirmative. The procedure authorized by state law was "obviously the product of state action."[47] The creditor's joint participation with state officials was sufficient to characterize that party as a state actor.[48] Quoting Adickes v. S.H. Kress & Co.,[49] the Court held that "[t]o act 'under color' of law does not require that the accused be an officer of the State. It is enough that he be a willing participant in a joint activity with the State or its agents."[50]
 
 
 36
 Moya alleged a conspiracy between the growers, their attorneys, the county sheriff and the state court judge who issued the TRO. In Dennis v. Sparks,[51] the plaintiffs similarly alleged a conspiracy between a judicial officer and the party who obtained an injunction. Although the judicial officer was immune from suit, the parties who engaged in a corrupt conspiracy with a state official were "willful participant[s] in joint action with the State or its agents" and were acting under color of state law for purposes of Sec. 1983.[52]
 
 
 37
 As Sparks emphasized, "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge."[53] The growers' action here extends beyond merely resorting to the courts to obtain a TRO. The growers acted in concert with their attorneys who were public officials and who were engaging in official duties throughout the strike. The attorneys, as criminal district attorneys, brought into this litigation the resources of the Texas Attorney General's Office and the county sheriff's office. These resources would not have been available to litigants operating in a purely private capacity.
 
 
 38
 B. Or None of the Above?
 
 
 39
 The situation we have before us does not fall neatly into any of the categories previously set out by the Supreme Court. There is no question but that the statutes relied upon by the growers satisfy the first prong of the Lugar test for "color of state law" and were the "product of state action."[54] The more difficult question is whether the growers can fairly be characterized as state actors. The growers are purely private individuals. Viewed in a vacuum, their action in filing suit and seeking a temporary restraining order cannot be viewed as state action.[55] The growers cannot be held liable in a Sec. 1983 suit simply because they filed suit under Texas statutes and obtained a temporary restraining order.
 
 
 40
 The action taken by the growers cannot be viewed in a vacuum, however. It arose out of deep-seated community hostility toward the strike, the strike organizers and the strikers themselves. The attorneys hired to represent the growers were also criminal district attorneys. Throughout the strike, while representing the growers in an ostensibly private action, the attorneys advised the sheriff of the provisions of the TRO and instructed them in means of enforcing compliance. The attorneys sought advice from the Attorney General of the State of Texas on the constitutionality of the Mass Picketing Statutes. Under Texas law, this advice could only be solicited by public officials in their public capacity. Throughout the litigation, deputy sheriffs and investigators with the sheriff's office reported the results of their observations on the picket lines to the growers' attorneys, who were at once public officials charged with the duty of enforcing state criminal laws, including civil injunctions, and private attorneys concerned with adequate representation of their private clients.
 
 
 41
 The interlocking activities of the State, through the criminal district attorneys, the Attorney General and the sheriff of Deaf Smith County, and the growers constituted a joint effort which justified the lower court's characterization of the growers as state actors. The activity here, while not compelled by the state, was so "significant[ly] encourage[ed, both] overt[ly] and covert[ly], that the choice must in law be deemed to be that of the state."[56] We once again emphasize that the growers cannot be considered state actors merely because they invoked a state statute. It was the heavy participation of state and state officials that brings this under color of state law.C. Were the Onion Growers Rotten?
 
 
 42
 It is clear that had the criminal district attorneys instituted criminal proceedings under these statutes, they would be entitled to absolute immunity under Sec. 1983 for actions taken in their capacity as public prosecutors. The same analysis holds for the Texas Attorney General issuing an opinion on the constitutionality of the Mass Picketing Statutes in the course of his official duties.[57] The immunity of public prosecutors is absolute because of the need to shield the prosecutor from harassment, embarrassment and unnecessary deflection from his or her public duties to defend civil lawsuits. It is critical that a public prosecutor be allowed unfettered exercise of professional judgment in the prosecution of a case. The public trust would suffer if every professional decision had to be made with an eye toward potential civil liability.[58]
 
 
 43
 The argument raised is that the growers should be likewise entitled to immunity because their actions were taken in a private prosecutorial capacity. Additionally, because the growers' liability is derived from the joint venture undertaken with acknowledged state agents, the argument follows that the growers should also be entitled to a derivative immunity, similar to that accorded the state agents.
 
 
 44
 Assuming, arguendo, that such an immunity exists, these private parties are entitled only to qualified immunity, measured under the standard of good faith. The public policy concerns which justify absolute immunity for prosecutors are not present when the party seeking immunity is acting in a private prosecutorial role. There are no public concerns regarding the exercise of independent professional judgment and there is no reason to encourage malicious litigation brought by private parties acting in a dual role as state actors.
 
 
 45
 There is no need for us to determine whether the growers are entitled to derivative immunity. The growers' assertions can be addressed without the need to decide that issue. The growers' challenge to the determination that they were not entitled to good faith immunity is based upon the premise that "a private party who invokes a presumptively valid state ... statute is entitled to good faith immunity from monetary liability under Sec. 1983.[59] If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."[60]
 
 
 46
 Good faith immunity measures good faith under an objective, not a subjective standard. The question is not whether the growers had a malicious motivation in filing suit but whether, at the time the suit was filed, there was an objectively reasonable basis for the suit, i.e., whether the statutes upon which the growers relied were presumptively valid.[61]
 
 
 47
 At the time this lawsuit was filed, no court in the State of Texas had ever suggested that article 5154d, Secs. 2 and 3 and article 5154g Sec. 2 were unconstitutional. While Medrano v. Allee[62] found article 5154d Secs. 1(1) and 1(2) and article 5154f to be unconstitutional, on remand no decision was reached on the constitutional issues. So far as these statutes are concerned, their constitutionality, or lack thereof, had not yet been settled. Reliance on these provisions could not in any way have negated the growers' good faith.
 
 
 48
 The District Court denied immunity on the basis that the unconstitutionality of article 5154f had been clearly established by the Texas Supreme Court in International Union of Operating Engineers v. Cox,[63] and Construction and General Labor Union v. Stephenson.[64] The ex parte procedure used by the growers to obtain the TRO had likewise been found unconstitutional in Carroll v. President and Commissioners of Princess Anne.[65] Because the growers did not act with objective good faith, the District Court correctly concluded that the growers are not entitled to good faith immunity for damages flowing from use of the provisions of article 5154f or from the use of the ex parte TRO procedure.[66]
 
 
 49
 The next difficulty arises out of the need to apportion the damages flowing from the use of article 5154f, for which there is no immunity, and those damages resulting from use of the other statutes, for which a good faith immunity can be justified. Although the District Court made no specific effort to do so, we conclude that by finding that Moya was entitled to $500.00 as compensation for injuries "sustained as a consequence of being restrained under the minority picketing provisions of art. 5154f, and of the improper ex parte procedure used to obtain the TRO," 615 F.Supp. at 941, the trial judge in effect awarded 100% of Moya's damages for these constitutional transgressions. The judge awarded nothing for any other asserted transgression, nor was any reduction made.
 
 D. But Not a Bumper Crop
 
 50
 While a more detailed explanation of what damages flowed from the use of the improper procedure and article 5154f would have been desirable, we cannot say that $500.00 is inadequate compensation for whatever injuries Moya may have suffered to his reputation and from the chilling effect the TRO had on the exercise of his First Amendment rights. We do not dispute the conclusion that Moya's First Amendment rights were violated. There was no abuse of discretion in this damage award.
 
 II. The Constitutional Challenges
 
 51
 Before we can reach the constitutional questions, it is first necessary to dispose of two fundamental stumbling blocks, for without standing and a live case or controversy, the tower of constitutional challenge must crumble. Delia Gamez-Prince and Texas Rural Legal Aid through Sec. 1983 filed suit directly under the Constitution, challenging the Mass Picketing Statutes. The District Court found Gamez-Prince to have standing; TRLA did not.
 
 A. Standing
 
 52
 Federal courts are courts of limited jurisdiction, those limits being defined by Congress under Article III of the Constitution.[67] Central to this concept is the requirement that there be a live case or controversy for a federal court, restricted to resolution of concrete disputes, to pass judgment on a law.[68]
 
 
 53
 The standing component of the case or controversy requirement requires a litigant to demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."[69] It is undisputed that Delia Gamez-Prince was a union member affected by the TRO. Following its issuance, she was compelled to abide by its terms, maintain the 50-foot spacing and refrain from using strident language. As the Mass Picketing Statutes are susceptible of both civil and criminal enforcement, it is not necessary to show threatened criminal prosecution where there is evidence of injury caused by civil enforcement. Gamez-Prince was arguably chilled in the exercise of her First Amendment rights by the issuance of a TRO under the authority of the Mass Picketing Statutes. This is a direct injury, suffered as a result of the operation of the challenged statutes. Delia Gamez-Prince had standing to raise that challenge.
 
 
 54
 As to TRLA, the District Court found no evidence to indicate that TRLA had suffered, or was in danger of suffering, any injury as a result of the operation of these statutes.[70] Finding no error in that determination, we uphold the ruling of the District Court that TRLA fails to satisfy the injury-in-fact requirement of Article III and therefore lacks standing to challenge the constitutionality of the Texas Mass Picketing Statutes.
 
 B. The Challenge Itself
 
 55
 Delia Gamez-Prince challenges the constitutionality of seven Texas statutes.[71] This is not the first time the constitutionality of these statutes has been raised. Based on previous state court interpretations of the breadth and scope of article 5154d Sec. 1(1) and article 5154f Sec.Sec. 2(d), and 2(e), we are persuaded that they unconstitutionally infringe on protected rights and interests. Consequently, we affirm the decision of the lower court as to these statutes.
 
 
 56
 Article 5154d Sec. 2 has been authoritatively construed by the Texas Supreme Court in such a way as to render it constitutional. We therefore reverse as to article 5154d Sec. 2.
 
 
 57
 Article 5154d Sec. 3 as written criminalizes any misrepresentation without fault. Even though the Texas Penal Code automatically incorporates a fault standard, this statute still fails to meet constitutional muster. We affirm the decision of the District Court that article 5154d Sec. 3 is unconstitutional.
 
 
 58
 Article 5154f Sec. 2(b) has been interpreted in such a way as to render it constitutional. We reverse the District Court as to this section.
 
 
 59
 Article 5154g Sec. 2, to the extent that it prohibits peaceful picketing to attain a lawful objective, is a constitutionally impermissible restraint on freedom of speech and cannot stand. The decision of the District Court with regard to this statute is affirmed.
 
 
 60
 Up to this time, the Texas Supreme Court has not specifically interpreted the Mass Picketing Statutes in their entirety. We agree with the growers, however, that the decision in Sherman v. State,[72] provides a guidepost to enable this court, in our Erie-role, to interpret the sections of the statute which have not been previously construed by the Texas Supreme Court. While Sherman is a narrow decision, limited strictly to section 1(2),[73] we feel it gives us adequate guidance to resolve these issues.
 
 1. Article 5154d Sec. 1(1)
 Too Close for Comfort
 
 61
 The injunction issued by the district court in this case prohibited the farm workers from placing more than two pickets within fifty feet of any entrance to the picketed premises or within fifty feet of any other picket. This portion of the injunction tracked almost exactly the numbers-distance formula of article 5154d Sec. 1(1).[74] We begin our analysis of this section with an examination of Sherman. While Sherman addressed only article 5154d Sec. 1(2), it is the only Texas Supreme Court decision on this article, and gives us a starting point for our independent interpretation of Sec. 1(1).
 
 
 62
 Herman Sherman was convicted of the offense of mass picketing for his knowing and intentional activity in blocking free ingress to and egress from the entrance to Buddy Schoellkopt Products, Inc.[75] in violation of article 5154d Sec. 1(2). The police officer who arrested Sherman testified that he told Sherman not to block cars leaving the plant. Four officers testified that Sherman slowed his pace as he crossed the driveway, causing at least one car to stop momentarily so as to avoid striking Sherman. Sherman was arrested and taken to jail in a waiting paddy wagon. There was no evidence of any violence by Sherman or any of the others in the vicinity of the picket line. There was no evidence that traffic out of the plant or on the adjacent street was stopped, only that one driver was required to pause momentarily.[76] On appeal, Sherman argued that article 5154d Sec. 1(2) was unconstitutionally vague and overbroad.
 
 
 63
 The Sherman court began its analysis of article 5154d with an examination of the nature of the State's interest. The stated purpose of the statute was an attempt to guarantee the safety and welfare of the general public while simultaneously safeguarding freedom of speech and assembly.[77] The means which the legislature chose to achieve this end was the prohibition of conduct which often led to the unwanted result of violence. The legislature intended to prevent violence by regulating the number and location of pickets and by prohibiting the obstruction of traffic to and from the premises being picketed. Sherman found this to be a significant interest.[78] Nonetheless, it was beyond question that peaceful labor picketing is protected by the First Amendment,[79] subject only to reasonable time, place and manner restrictions.[80]
 
 
 64
 Sherman contended on appeal that the statute was vague because it contained no definition of the term "obstruction." After reviewing the general rules for construction of statutes, foremost among them being the presumption that the legislature intends statutes to be constitutional,[81] the court concluded that the word "obstruction," as used in article 5154d Sec. 1(2), meant the same as the word "obstruction" defined by Penal Code Sec. 42.03(b). Under this construction, article 5154d Sec. 1(2) prohibited the "rendering impassible or the rendering unreasonably inconvenient or hazardous the free ingress or egress to the struck premises."[82] This definition cured the vagueness problem while allowing the First Amendment ample breathing space.
 
 
 65
 The court was next called upon to address the problem of overbreadth in the phrase "any character of obstacle." The argument was that this served to criminalize "mere momentary interferences which are so temporary and incidental that they do not constitute imminent threats of violence or public disorder." The court resolved this problem by defining "character of obstacle" to be synonymous with "type of obstacle," not "degree of obstacle." An obstruction, whether a human body, a log or an automobile barricade, is only criminal when it completely or unreasonably restricts passage. Using this construction, article 5154d Sec. 1(2) was not overbroad.[83]
 
 
 66
 In the years since Sherman, our research has uncovered only one intermediate state court decision addressing the numbers-distance formula of Article 5154d: Olvera v. State.[84] Olvera disagrees sharply with the three federal District Courts which have recently interpreted the same statutes.[85] Drawing from the narrowing constructs of Sherman, Olvera held that the valid public interest in preventing violence and maintaining free passageway in public areas justified some First Amendment infringement. By defining the term "picketing" as used in these statutes to be the equivalent of "patrolling" as used in the context of federal labor disputes,[86] the Texas Court of Appeals found the statutes sufficiently narrow to pass constitutional muster.[87]
 
 
 67
 The problem with this resolution is that it really does not narrow the statute. Olvera relied on Bakery Drivers v. Wohl[88] to conclude that picketing is synonymous with patrolling and therefore can be regulated by the state. Justice Douglas, in his concurring opinion in Bakery Drivers, was simply stating that picketing is more than pure speech because it involves physical activity. It is the introduction of conduct into a speech activity that subjects picketing to restrictive legislation.
 
 
 68
 Nonetheless, it is imperative to remember that picketing, as form of expression, cannot be entirely banned. While restrictive legislation is permitted, it must be the result of a compelling state interest, and the regulation must be narrowly tailored so as not to infringe unduly on the First Amendment.
 
 
 69
 We can discern no difference between picketing and patrolling sufficient to allow this statute automatically to pass constitutional muster. To the extent that the conduct being regulated is an element of speech, the statute is still subject to constitutional scrutiny.
 
 
 70
 In marked contrast to Olvera, the lower federal courts which have interpreted these statutes have unanimously found them to be unconstitutional. Two of those decisions form the basis for this appeal: Nash, supra, and Gault, supra. The third, Medrano, supra, declared article 5154d Sec. 1 and article 5154f unconstitutional on overbreadth grounds.[89] As applied, the Medrano court declared article 5154d Sec. 1(1), prohibiting more than two pickets within 50 feet of any entrance or other picket, unconstitutional.[90]
 
 
 71
 Gault, addressing only the numbers-distance formula of article 5154d Sec. 1(1), expressly adopted the reasoning of the District Court in the published Medrano opinion. "[T]he statute [5154d Sec. 1] establishes a mathematical straitjacket which does not permit law officers or courts to take into account the factual context of a particular picket line.... Little imagination is required to envisage circumstances where groups of demonstrators, substantially larger than two persons, standing at closer quarters than fifty feet would not threaten the safe flow of traffic nor unreasonably interfere with free ingress or egress from nearby buildings."[91] Finding this statute to lack the precise and narrow tailoring required by the Supreme Court to validate a time, place and manner restriction, Gault held the statute unconstitutionally overbroad.[92]
 
 
 72
 After an analysis of permissible time, place and manner restrictions, the Nash court reached the same conclusion as Medrano and Gault. Nash identified a compelling state interest (the prevention of violence at picket lines) and found the statute to be content neutral, the absence of either being potential constitutional stumbling blocks for time, place and manner restrictions. The statute was nonetheless fatally flawed because it was not narrowly drawn, nor was it rationally related to the state interest in preventing violence. As the numbers-distance formula did not provide the necessary breathing space for the First Amendment, it was declared unconstitutional.[93]
 
 
 73
 A statute is unconstitutionally overbroad only if "the overbreadth of [the] statute is not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[94] "There is a realistic danger of, and a substantial potential for, the unconstitutional application" of this statute.[95] Accordingly, we agree with the lower courts that this statute infringes too severely on constitutionally protected freedoms. This statute is so broadly written that it cannot help but have a deterrent effect on the exercise of First Amendment rights. We therefore affirm the conclusion that article 5154d Sec. 1, as it extends to mass picketing as defined in article 5154d Sec. 1(1), is unconstitutionally overbroad and cannot stand.
 
 2. Article 5154d Sec. 2
 
 74
 Only "Fighting Words"?
 
 
 75
 With regard to article 5154d Sec. 2,[96] the defendants argue that the Texas Supreme Court decision in Dallas General Drivers v. Wamix, Inc.,[97] has authoritatively limited the reach of the statute to prohibit only "fighting words" as defined by Chaplinsky v. New Hampshire.[98] The District Court disagreed and found the statute unconstitutionally overbroad. While Wamix does not mention Chaplinsky, this court "may and should consider whether the enactment is 'readily subject to a narrowing construction by the state courts.' "[99] We do so and find that this statute is readily subject to the constraints of Chaplinsky and a state court is likely to hold that article 5154d Sec. 2 prohibits only "fighting words" as defined by Chaplinsky.
 
 
 76
 Wamix involved a dispute between an employer (Wamix) and the union (Dallas General Drivers) over negotiations which were entered into with the intention of executing a contract. Wamix entered these negotiations under protest by order of the NLRB, which order was subsequently affirmed by this court. When an agreement could not be reached, Wamix broke off negotiations. Wamix employees set up a picket line. The striking employees were immediately replaced with new employees. While this was going on, the NLRB adopted new, more restrictive, standards for determining whether the NLRB had jurisdiction over a labor dispute. Wamix sought a modification of the earlier order rendered by the NLRB ordering Wamix to bargain with the union on the grounds that under the new standards, the NLRB was without jurisdiction. The Fifth Circuit denied the motion to modify. Wamix then filed suit in state court against the union seeking a restraining order and a temporary and permanent injunction prohibiting the picketing activities.
 
 
 77
 Upon hearing, the trial court granted a temporary injunction requiring the union to refrain from (i) picketing certain locations, (ii) publishing orally or in writing that Wamix trucks were being driven by strike breakers, and (iii) using insulting, threatening and indecent language toward nonstriking employees for the purpose of interfering with, hindering and intimidating those employees.[100]
 
 
 78
 On appeal, with regard to the prohibition from using insulting, threatening and indecent language, the injunction was dissolved because there was no reasonable probability that the defendants would use such language in the absence of an injunction. While reaffirming the proposition that the right to speak ill of another is a right protected by the state constitution, the Wamix court admitted that intimidating and coercive language was not protected. In an appropriate situation, an injunction would lie to prohibit intimidating or coercive speech. In Wamix, where there had been a single isolated reference to a Wamix employee as a "damned scab," absent evidence that "language will be used which is intimidating and coercive in character, and calculated to intimidate and coerce [employees] not to perform their duties," the District Court was without power to control speech by way of injunction.[101]
 
 
 79
 In Chaplinsky, the United States Supreme Court was faced with a New Hampshire statute which penalized the use of "offensive, derisive or annoying" words to any other person lawfully in a public place, or to call any other person by an "offensive or derisive" name. Chaplinsky was arrested for calling someone a "God damned racketeer" and a "damned fascist." He was charged and convicted under this statute and his conviction was upheld by the New Hampshire Supreme Court.
 
 
 80
 The New Hampshire Supreme Court interpreted the word "offensive" to extend only to those words "plainly likely to cause a breach of the peace." The United States Supreme Court had no trouble affirming the statute, thus construed, as a valid exercise of the state power to prohibit the "use in a public place of words likely to cause a breach of the peace."[102]
 
 
 81
 Wamix, while coming some fourteen years after Chaplinsky, makes absolutely no reference to that opinion. No other Texas court has addressed this particular aspect of this statute. Nonetheless, this Court is in a position to hypothesize whether a state court is likely to narrow the statute's construction. In doing so, we are mindful of the statutory construction principles set out in Sherman, supra.[103] Accordingly, we start with the presumption that a statute was intended to comply with the constitutions of the state and the United States.[104]
 
 
 82
 Given this starting point, the only feasible construction of article 5154d Sec. 2 is that its reach is limited to "fighting words," as that term is defined by Chaplinsky standards. "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include ... the insulting or 'fighting' words--those which by their very utterance inflict injury or tend to incite an immediate breach of the peace ... [s]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[105]
 
 
 83
 With this limiting construction possible, article 5154d Sec. 2 is not substantially overbroad.
 
 3. Article 5154d Sec. 3
 
 84
 "Criminal" Misrepresentation?
 
 
 85
 The District Court found article 5154d Sec. 3[106] to be unconstitutional because it criminalized "any misrepresentation without fault and without regard to whether the speech is on a matter of public concern."[107] On its face, the lack of any standard of fault renders the statute overbroad and unconstitutional.[108] Even incorporating the standard of fault contained in the Texas Penal Code, this section is an unconstitutional infringement on protected speech and cannot stand. The State cannot make it a criminal offense to picket if a single picket makes an oral misrepresentation about anything at all, regardless of its relevance to the strike or any other matter of public concern.
 
 
 86
 Article 5154d Sec. 3 as written contains no standard of fault. Once again drawing on Sherman, however, it is evident that article 5154d Sec. 3 does contain a standard of fault--that enunciated by Sec. 6.02 of the Penal Code. "If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." As article 5154d Sec. 3 does not "plainly dispense with any mental element," Sec. 6.02(c) of the Penal Code provides that "intent, knowledge, or recklessness suffices to establish criminal responsibility."[109]
 
 
 87
 The question remaining for this court is whether this standard suffices under the Constitution. In a civil action for libel or defamation, it is clear that intent, knowledge or recklessness is enough, as knowing or reckless falsehoods are not protected by the Constitution.[110] We are not, however, addressing a civil liability statute, but a statute which imposes criminal consequences on the intentional, knowing or reckless utterance of a falsehood.
 
 
 88
 This statute cuts too broad a swath. "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech."[111] If the "profound national commitment" to uninhibited and robust debate on public issues is to be upheld,[112] the state cannot criminalize the mere utterance of a falsehood.[113] The state cannot make it a criminal offense to picket if a single picket makes an oral misrepresentation about anything at all, regardless of its relevance to the strike or any other matter of public concern.[114] This statute cannot help but chill the exercise of free speech. Article 5154d Sec. 3 goes too in restricting speech protected by the First Amendment. It cannot stand.
 
 4. Article 5154f
 Secondary Picketing
 
 89
 Article 5154f proscribes various forms of secondary picketing activities and defines those activities which are proscribed.[115] In International Union of Operating Engineers v. Cox[116] and Construction and General Labor Union v. Stephenson,[117] the Texas Supreme Court declared article 5154f to be unconstitutional to the extent that the meaning of "labor dispute" was restricted to a controversy between an employer and a majority of his or her employees and to the extent that picketing was prohibited except where such a controversy existed.[118] Since knocking the cornerstone away from this statute in Cox, supra and Stephenson, supra, the Texas Supreme Court has remained silent. This court is therefore called upon to decide whether the remaining sections have fallen with the cornerstone. We hold that article 5154f Sec. 1 is unconstitutional insofar as it extends to secondary boycotts as defined in article 5154f Sec. 2(e). So far as article 5154f Sec. 1 extends to secondary picketing as defined in article 5154f Sec. 2(d), it is constitutionally valid.
 
 
 90
 a. Article 5154f Sec. 2(d)
 
 
 91
 The Gault court found article 5154f Sec. 2(b), (d), (e), to be unconstitutionally overbroad and adopted the reasoning of Medrano.
 
 
 92
 The Texas Supreme Court in Stephenson, supra, declared invalid an injunction which prohibited picketing where the individual being picketed was not involved in a labor dispute with his employees.[119] Stephenson invalidated that portion of an injunction which prohibited picketing unless a valid labor dispute existed between Stephenson and a majority of his employees. To the extent that "labor dispute" was restricted to a controversy between an employer and his employee, and prohibited picketing except under such circumstances, the statute was invalid under the Fourteenth Amendment to the United States Constitution.[120]
 
 
 93
 Stephenson did not go so far as to completely invalidate article 5154f, however. In Stephenson, the union had a legitimate concern with the work being done by Stephenson's employees. A lack of a legitimate concern was therefore not a reason to invalidate this injunction. The court left open the possibility that picketing could be prohibited in the absence of a "real and substantial interest" by the union in the work taking place on Stephenson's job.[121]
 
 
 94
 The Gault court, in addressing this same statute, Sec. 2(d), adopted the reasoning of Medrano. Because the Texas Supreme Court had declared article 5154f unconstitutional to the extent that "labor dispute" was restricted to a controversy between an employer and a majority of his employees, Medrano concluded that Sec. 2(d) was unconstitutional because it clearly relied on the absence of an employer-employee relationship.
 
 
 95
 We disagree. Stephenson, by expanding the definition of "labor dispute" to include situations where the labor union has a real and substantial interest in the work taking place at a picketing site, saves this portion of the statute from constitutional infirmity. The state is forbidden to exclude employees from exercising their rights of free speech by "drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."[122] Stephenson expands the circle sufficiently to allow article 5154f Sec. 2(d) to stand.[123]
 
 
 96
 So far as article 5154f Sec. 1 extends to secondary picketing as defined by article 5154f Sec. 2(d), and expanded by Stephenson, it is constitutional.
 
 
 97
 b. Article 5154f Sec. 2(b)
 
 
 98
 Once again following Medrano, Gault then turned to secondary strikes under Sec. 2(b) and noted that Sec. 1 prohibited aiding and abetting a secondary strike. Picketing could be seen as aiding a secondary strike, whether or not the picketing's purpose was to violate a legitimate state policy. Section 2(b) thus swept too broadly.
 
 
 99
 The Supreme Court in Teamsters Union v. Vogt reaffirmed the principle that there is "a broad field in which a state, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy."[124] In order to constitutionally prohibit picketing, however, there must be an identifiable, legitimate and specific state policy. Texas has not shown us that such a specific policy exists here. Article 5154f Sec. 2(b) thus includes within its proscription activity which the state cannot legitimately prohibit.[125]
 
 
 100
 Article 5154f Sec. 2(b) is unconstitutionally overbroad.
 
 
 101
 c. Article 5154f Sec. 2(e)
 
 
 102
 Gault finally turned to Sec. 2(e) secondary boycotts, which are plans by two or more persons to cause "injury or damage" to a firm for which they are not employees. Section 2(e)(2) lists picketing as a means of injury and, of course, Sec. 1 prohibits aiding and abetting a secondary boycott by any of the other methods listed in Sec. 2. Because "injury or damage" do not point to specific evils, once again adopting the reasoning of Medrano, Gault declared Sec. 2(e) unconstitutionally overbroad.
 
 
 103
 We agree with Medrano that article 5154f Sec. 2(e) is too broadly drawn to withstand constitutional scrutiny. While a state may prohibit picketing to prevent certain specific evils,[126] "damage or injury," no matter how slight or subtle is too vague a purpose. "Judicial balance of this sort of 'purpose' with the right to freedom of speech would be a haphazard office at best."[127]
 
 5. Article 5154g Sec. 2
 
 104
 What is an "Unlawful Objective"?
 
 
 105
 The last remaining challenge is to article 5154g Sec. 2.[128] Section 1 states that it is Texas public policy that the right of persons to work shall not be abridged or denied because of union membership or its lack. Section 2 prohibits picketing that has as its objective compelling an employer to (i) recognize or bargain with a minority union, or compelling an employee to (ii) join a minority union or select one as his or her bargaining representative.
 
 
 106
 Gault found that Sec. 2 outlawed picketing where the objective is either (i) to compel an employer to recognize or bargain with a minority union, or (ii) to compel an employee to join a minority union or select one as his bargaining representative. These are lawful objectives, however, and Texas cannot prohibit picketing to obtain lawful objectives. Although the goal of a minority union to bargain on behalf of all the members of a bargaining unit may constitutionally be outlawed, Sec. 2 seeks to outlaw picketing even when the minority union seeks only to represent its own members in a primary dispute over wages and working conditions. This is a permissible objective that cannot constitutionally be outlawed. Consequently, Gault held the statute unconstitutional.
 
 
 107
 A state may permissibly enjoin peaceful picketing whose objective is prohibited by state Right-to-Work laws.[129] Under the National Labor Relations Act, 29 U.S.C. Sec. 151 et seq., it has been held that the right to bargain belongs exclusively to the certified representative of a majority of the employees and that picketing to force an employer to bargain with a minority union seeking to represent all members of the bargaining unit can be constitutionally prohibited.[130]
 
 
 108
 Section 2 goes beyond both of these permissible restraints and prohibits picketing to obtain an objective which is not only lawful, but protected by the dictates of the First Amendment. It is not unlawful for employees to join a minority union.[131] To the extent that article 5154g Sec. 2 prohibits peaceful picketing to attain a lawful objective, it is a constitutionally impermissible restraint and cannot stand.[132]
 
 
 109
 If we assume that Sec. 2 is itself an attempt to outlaw selection of a minority union by individual employees independent of any right of recognition as a bargaining representative, we conclude, as did the District Court,[133] that this statute is still unconstitutional. Employees have a constitutional right to form and join a union, a right protected by the guarantees of the First Amendment.[134] To the extent that Sec. 2 prohibits this, it must fall.
 
 
 110
 We wish to emphasize that the associational right implicated here does not permit picketing in contravention of the requirements of the NLRA. The right of employees to form and join a union, or any other group no matter how named, cannot be prohibited, however. On its face, section 2 prohibits more than simply coerced membership and thereby goes beyond the permissible restraints of the NLRA. The state cannot forbid peaceful expression by calling it coercion. The District Court correctly concluded that article 5154g, Sec. 2 was unconstitutionally overbroad.
 
 III. Bagging all the Onions
 
 111
 In sum, we affirm the judgment awarding Jesus Moya $500 in damages for the violation of his civil rights. The onion growers, by acting in concert with various state officials who were acting in their official capacity, were state actors for purposes of Sec. 1983, and caused Jesus Moya to be deprived of rights guaranteed by the First Amendment.
 
 
 112
 We also affirm that portion of the decision of the District Court which held Texas Revised Civil Statutes article 5154d Secs. 1(1) and 3, article 5154f Secs. 2(b) and 2(e) and article 5154g Sec. 2 to be unconstitutionally overbroad. These statutes infringe upon the guarantees of the First Amendment and cannot stand. We reverse the District Court and find that articles 5154d Sec. 2 and 5154f Sec. 2(d) are constitutional, since these two portions of the statute have been interpreted in such a way as to withstand constitutional scrutiny.
 
 
 113
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 114
 PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:
 
 
 115
 I concur with one caveat. This case came to the court below and here as a bag of confusing, broadly gauged arguments. This is particularly distressing because this substantive area demands surgical precision. The district court and Judge Brown have done an admirable job of presenting the confusing arguments in a coherent fashion. But I do not want the creation of this silk purse to mislead. Our treatment of standing, state action, and overbreadth respond to a unique set of facts, and one that has developed with the surrealistic sense that the two-hatted lawyers who obtained enforcement here have revived an earlier practice of using state court injunctions to bust unions. Because we do not retreat even a step from our insistence on standing, state action or substantial overbreadth, I join.
 
 
 
 [1]
 Article 5154d Secs. 1(1) and 1(2) provide:
 
 
 [1]
 It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined
 "Mass picketing," as that term is used herein, shall mean any form of picketing in which:
 
 
 [1]
 There are more than two (2) pickets at any time within either fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets
 
 
 [2]
 Pickets constitute or form any character of obstacle to the free ingress to and egress from any entrance to any premises being picketed or to any other premises, either by obstructing said free ingress or egress by their persons or by the placing of vehicles or other physical obstructions
 The term "picket," used in this Act, shall include any person stationed by or acting for and in behalf of any organization for the purpose of inducing, or attempting to induce, anyone not to enter the premises in question or to observe the premises so as to ascertain who enters or patronizes the same, or who by any means follows employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.
 The term "picketing," as used in this Act, shall include the stationing or posting of one's person or of others for and in behalf of any organization to induce anyone not to enter the premises in question, or to observe the premises so as to ascertain who enters or patronizes the same, or to follow employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.
 
 
 [2]
 Article 5154d Sec. 2 provides:
 
 
 [2]
 It shall be unlawful for any person, singly or in concert with others, by use of insulting, threatening or obscene language, to interfere with, hinder, obstruct, or intimidate, or seek to interfere with, hinder, obstruct, or intimidate, another in the exercise of his lawful right to work, or to enter upon the performance of any lawful vocation, or from freely entering or leaving any premises
 
 
 [3]
 Article 5154d Sec. 3 provides:
 
 
 [3]
 It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activities, where any part of such picketing is accompanied by slander, libel, or the public display or publication of oral or written misrepresentations
 
 
 [4]
 Article 5154f provides:
 
 
 [1]
 It shall be unlawful for any persons or association of persons, or any labor union, incorporated or unincorporated, or the members or agents thereof, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott, as those terms are defined herein
 
 
 [2]
 As used in this Act:
 b. "Secondary strike" shall mean a temporary stoppage of work by the concerted action of two or more employees of an employer where no labor dispute exists between the employer and such employees, and where such temporary stoppage results from a labor dispute to which such two or more employees are not parties.
 d. The term "secondary picketing" shall mean the act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees.
 e. The term "secondary boycott" shall include any combination, plan, agreement or compact entered into or any concerted action by two or more persons to cause injury or damage to any person, firm or corporation for whom they are not employees, by
 (1) Withholding patronage, labor or other beneficial business intercourse from such person, firm or corporation; or
 (2) Picketing such person, firm or corporation; or
 (3) Refusing to handle, install, use or work on the equipment or supplies of such person, firm or corporation; or
 (4) Instigating or fomenting a strike against such person, firm or corporation; or
 (5) Interfering with or attempting to prevent the free flow of commerce; or
 (6) By any other means causing or attempting to cause an employer with whom they have a labor dispute to inflict any damage or injury to an employer who is not a party to such labor dispute.
 
 
 [3]
 Any person who shall violate any of the provisions of this Act shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding Five Hundred ($500.00) Dollars, or by confinement in the county jail not to exceed six months, or by both such fine and imprisonment
 
 
 [4]
 Any person who violates any of the provisions of this Act shall be liable to the person suffering the same for all damages resulting therefrom, and the person damaged is hereby given right of action and access to the courts to redress such wrong or damage, including injunctive relief; and any association or labor union, local, state, national or international, which represents or purports to represent any such person violating any of the provisions of this Act shall be jointly and severally liable with any such person for all such damages resulting thereby
 
 
 [5]
 The State of Texas, through its Attorney General or any District or County Attorney, may institute a suit in the District Court to enjoin any person, association of persons, labor union, firm or corporation, from violating any provision of this Act
 
 
 [5]
 Article 5154g Secs. 1, 2, and 5 provides:
 
 
 [1]
 It is hereby declared to be the public policy of the State of Texas that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization and that in the exercise of such rights all persons shall be free from threats, force, intimidation or coercion
 
 
 [2]
 It shall be a violation of the rights set forth in Section 1 for any person or persons, or associations of persons, or any labor union or labor organization, or the members or agents thereof, acting singly or in concert with others, to establish, call, maintain, participate in, aid or abet any strike or picketing, an object of which is to urge, compel, force or coerce any employer to recognize or bargain with, or any employee or group of employees to join or select as their representative, any labor union or labor organization which is not in fact the representative of a majority of the employees of an employer or, if the employer operates two or more separate and distinct places of business, is not in fact the representative of a majority of such employees at the place or places of business subjected to such strike or picketing
 
 
 [5]
 The State of Texas, through its Attorney General or any District or County Attorney, may institute suit in the District Court to enjoin any person or persons, association of persons, labor union or labor organization from violating any provision of this Act
 
 
 [6]
 It was an attorney in the Attorney General's office who first suggested that a TRO be sought. The same attorney appears to have represented the State of Texas in Medrano v. Allee, 347 F.Supp. 605 (S.D.Tex.1972), vacated and remanded, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), discussed in greater detail infra, in which the constitutionality of articles 5154d Secs. 1(1), 1(2) and 5154f was litigated
 
 
 [7]
 Articles 5154f Sec. 5, 5154g Sec. 5, see nn. 4, 5, supra
 
 
 [8]
 615 F.Supp. at 932-33
 
 
 [9]
 615 F.Supp. at 932
 
 
 [10]
 Tex.Rev.Civ.Stat.Ann. art. 4399
 
 
 [11]
 615 F.Supp. at 932
 
 
 [12]
 Article 5154d Sec. 1(1), n. 1, supra
 
 
 [13]
 Article 5154d Sec. 1(2), n. 1, supra
 
 
 [14]
 Article 5154d Sec. 2, n. 2, supra
 
 
 [15]
 Article 5154d Sec. 3, n. 3, supra
 
 
 [16]
 See n. 4, supra
 
 
 [17]
 Id
 
 
 [18]
 Article 5154g Sec. 2, n. 7, supra
 
 
 [19]
 Gault, 615 F.Supp. at 927-28
 
 
 [20]
 Delia Gamez-Prince was arrested later in the summer for trespassing when she entered an onion field to discuss a wage claim with a worker
 
 
 [21]
 Article 5154d Secs. 1(1), 2, and 3; Article 5154f Secs. 2(b), 2(d), and 2(e); and Article 5154g Sec. 2. See nn. 1-5, supra
 
 
 [22]
 42 U.S.C. Sec. 1983 provides as follows:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [23]
 615 F.Supp. at 933
 
 
 [24]
 There are special ethical considerations which must be taken into account by public prosecutors who also engage in private representation. Saul, Smith and Davis all assumed that private representation of the growers was permissible so long as they disqualified themselves from any subsequent criminal prosecution arising out of the strike. The difficulty in walking this line is apparent in this case where it is often unclear in which capacity the attorneys were acting. See 615 F.Supp. at 932 n. 1
 
 
 [25]
 Roberts v. Louisiana Downs, Inc., 742 F.2d 221, 224 (5th Cir.1984)
 
 
 [26]
 Id.; Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597 (5th Cir.1988)
 
 
 [27]
 F.R.Civ.P. 52(a). Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1984)
 
 
 [28]
 481 U.S. ----, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987)
 
 
 [29]
 Tex.Prop. Code Ann. Secs. 52.001-.006 (1984)
 
 
 [30]
 Tex.R.Civ.P. 627
 
 
 [31]
 A supersedeas bond does not prevent the securing of liens, only the execution of the judgment through seizure and sale of property
 
 
 [32]
 Tex.R.Civ.P. 364(b)
 
 
 [33]
 The basic argument raised by Texaco, and accepted by the lower courts, was that, as applied in this case, the Texas bond provisions violated the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution. Texaco v. Pennzoil, 626 F.Supp. 250, 257 (S.D.N.Y.1986)
 
 
 [34]
 The Supreme Court reversed the judgments of the two lower courts and vacated the appeal on the ground that the District Court should have abstained under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Pennzoil v. Texaco, 481 U.S. at ----, 107 S.Ct. at 1525, 95 L.Ed.2d at 15
 
 
 [35]
 481 U.S. at ----, 107 S.Ct. at 1531, 95 L.Ed.2d at 28 (Stevens, Brennan, Marshall, Blackmun JJ. concurring). See also Lugar, supra, n. 26
 
 
 [36]
 784 F.2d at 1147; 626 F.Supp. at 259. The district court held, without analysis of the "color of state law" provisions, that Texaco's federal claims were properly brought under Sec. 1983
 
 
 [37]
 See Dennis v. Sparks, 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185, 189 (1980)
 
 
 [38]
 Cobb v. Georgia, 757 F.2d 1248 (11th Cir.1985)
 
 
 [39]
 Dahlberg v. Becker, 748 F.2d 85, 92-93 (2d Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985)
 
 
 [40]
 784 F.2d at 1147
 
 
 [41]
 At the time the federal litigation commenced, the state court judgment had not yet been entered, much less made executory. 481 U.S. at ----, 107 S.Ct. at 1523, 95 L.Ed.2d at 12, n. 5. Pennzoil had agreed to waive the supersedeas bond and lien provisions to the extent the court determined that Texaco had provided adequate security. 626 F.Supp. at 257
 
 
 [42]
 Id
 
 
 [43]
 Supra, n. 26
 
 
 [44]
 457 U.S. at 925, 102 S.Ct. at 2447, 73 L.Ed.2d at 487
 
 
 [45]
 The requirements for action taken under color of state law for Sec. 1983 and state action under the Fourteenth Amendment are identical. Lugar, 457 U.S. at 927-29, 102 S.Ct. at 2748-49, 73 L.Ed.2d at 489-90
 
 
 [46]
 457 U.S. at 940, 102 S.Ct. at 2755, 73 L.Ed.2d at 497
 
 
 [47]
 457 U.S. at 941, 102 S.Ct. at 2755, 73 L.Ed.2d at 498
 
 
 [48]
 Id
 
 
 [49]
 398 U.S. at 152, 90 S.Ct. at 1605, 26 L.Ed.2d at 151
 
 
 [50]
 Id. [citations omitted]
 
 
 [51]
 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)
 
 
 [52]
 449 U.S. at 27, 101 S.Ct. at 186, 66 L.Ed.2d at 189
 
 
 [53]
 449 U.S. at 29, 101 S.Ct. at 187, 66 L.Ed.2d at 190
 
 
 [54]
 457 U.S. at 941, 102 S.Ct. at 2755, 73 L.Ed.2d at 498
 
 
 [55]
 Cobb v. Georgia Power Co., 757 F.2d 1248, 1251 (11th Cir.1985); Taylor v. Gilmartin, 686 F.2d 1346 (10th Cir.1982), cert. denied, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); Dahl v. Akin, 630 F.2d 277 (5th Cir.1980), cert. denied, 451 U.S. 908, 101 S.Ct. 1977, 68 L.Ed.2d 296 (1981); District 28 UMW v. Wellmore Coal Co., 609 F.2d 1083 (4th Cir.1979); Louisville Area Inter-Faith Committee v. Nottingham Liquors, Ltd., 542 F.2d 652 (6th Cir.1976)
 
 
 [56]
 Blum v. Yaretsky, 457 U.S. 991, 992, 102 S.Ct. 2777, 2778, 73 L.Ed.2d 534, 537 (1982). See also Adickes v. S.H. Kress & Co., supra, n. 26
 
 
 [57]
 Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)
 
 
 [58]
 424 U.S. at 425, 96 S.Ct. at 992, 47 L.Ed.2d at 140
 
 
 [59]
 Folsom Investment Co. v. Moore, 681 F.2d 1032, 1033 (5th Cir.1982)
 
 
 [60]
 Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982)
 
 
 [61]
 Harlow v. Fitzgerald, supra, n. 60; Butz v. Economu, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)
 
 
 [62]
 347 F.Supp. 605 (S.D.Tex.1972), vacated in relevant part, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)
 
 
 [63]
 148 Tex. 42, 219 S.W.2d 787 (1949)
 
 
 [64]
 148 Tex. 434, 225 S.W.2d 958 (1950)
 
 
 [65]
 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)
 
 
 [66]
 Any inequity flowing from the imposition of liability on the growers for the ineptitude of their attorneys in filing suit under an unconstitutional statute may be addressed in a malpractice action. While the growers may not be expected to engage in constitutional research themselves, as between the growers and Jesus Moya, the growers as principals should bear the risk of actions taken by counsel who make improvident decisions
 
 
 [67]
 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)
 
 
 [68]
 Younger v. Harris, 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669, 680 (1971)
 
 
 [69]
 Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895, 906 (1979)
 
 
 [70]
 615 F.Supp. at 945
 
 
 [71]
 See notes 1-5, supra
 
 
 [72]
 626 S.W.2d 520 (Tex.Crim.App.1981)
 
 
 [73]
 626 S.W.2d at 527 n. 7
 
 
 [74]
 Article 5154d Sec. 1(1) provides:
 
 
 [1]
 It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined
 "Mass picketing," as that term is used herein, shall mean any form of picketing in which:
 
 
 [1]
 There are more than two (2) pickets at any time within either fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets
 
 
 [75]
 Coincidentally, the same plant being picketed in the companion case of State v. Nash
 
 
 [76]
 626 S.W.2d at 522
 
 
 [77]
 Acts 1947, 50th Leg., p. 239, ch. 138. V.A.C.S. article 5154d, historical note following Sec. 6
 
 
 [78]
 626 S.W.2d at 524
 
 
 [79]
 Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)
 
 
 [80]
 Police Dept. of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)
 
 
 [81]
 Code Construction Act, Chapt. 455, Sec. 3.01, repealed and re-enacted as V.T.C.A., Government Code Sec. 311.021(1)
 
 
 [82]
 626 S.W.2d at 526
 
 
 [83]
 A Mississippi statute containing language similar to the construction used here has been upheld in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968)
 
 
 [84]
 725 S.W.2d 400 (Tex.App.--Houston [1st Dist.] 1987, review granted May 25, 1988)
 
 
 [85]
 One of those cases is the subject of this appeal, Gault v. TRLA, 615 F.Supp. 916 (N.D.Tex.1985) (article 5154d, Secs. 1(1), 2, 3, article 5154f, Secs. 2(b), (d), (e) and article 5154g Sec. 2 unconstitutionally overbroad); a second is the subject of appeal in the companion case of Nash v. Texas, 632 F.Supp. 951 (E.D.Tex.1986) (article 5154d, Secs. 1(1) and 2 unconstitutional). The third, Medrano, supra, declared articles 5154d Sec. 1 and 5154f unconstitutionally overbroad)
 
 
 [86]
 See NLRB v. Retail Store Employees Union, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring); Bakery Drivers v. Wohl, 315 U.S. 769, 776-77, 62 S.Ct. 816, 819-20, 86 L.Ed. 1178, 1184 (1942) (Douglas, J., concurring)
 
 
 [87]
 725 S.W.2d at 405
 
 
 [88]
 See n. 87, supra
 
 
 [89]
 That portion of the judgment was vacated by the United States Supreme Court and remanded for reconsideration in light of Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)
 Steffel involved questions of the propriety of Sec. 1983 relief during the pendency of a state criminal prosecution. It is not relevant to the questions of constitutionality raised here.
 On remand, the Medrano plaintiffs withdrew their challenge to the facial unconstitutionality of the statutes; consequently, there was no final adjudication of the constitutionality of article 5154f Secs. 1 and 2.
 
 
 [90]
 On remand, the District Court reconsidered Medrano in a 1976 unpublished opinion
 
 
 [91]
 347 F.Supp. at 624
 
 
 [92]
 615 F.Supp. at 946
 
 
 [93]
 632 F.Supp. at 932
 
 
 [94]
 Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 841 (1973)
 
 
 [95]
 Hill v. City of Houston, 789 F.2d 1103, 1110 (5th Cir.1986), aff'd, --- U.S. ----, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)
 
 
 [96]
 Article 5154d Sec. 2 provides:
 
 
 [2]
 It shall be unlawful for any person, singly or in concert with others, by use of insulting, threatening or obscene language, to interfere with, hinder, obstruct or intimidate, another in the exercise of his lawful right to work, or to enter upon the performance of any lawful vocation, or from freely entering or leaving any premises
 
 
 [97]
 l56 Tex. 408, 295 S.W.2d 873 (1956)
 
 
 [98]
 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)
 
 
 [99]
 Hill v. City of Houston, supra at 1112, quoting Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 & n. 15, 95 S.Ct. 2268, 2276 & n. 15, 45 L.Ed.2d 125, 135 & n. 13 (1975) (emphasis added)
 
 
 [100]
 295 S.W.2d at 876
 
 
 [101]
 295 S.W.2d at 879
 
 
 [102]
 315 U.S. at 573, 62 S.Ct. at 770
 
 
 [103]
 626 S.W.2d at 525-26
 
 
 [104]
 V.T.C.A., Government Code Sec. 311.021(1)
 
 
 [105]
 315 U.S. at 572-73, 62 S.Ct. at 769-70, (footnotes omitted)
 
 
 [106]
 Article 5154d Sec. 3 provides:
 
 
 [3]
 It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activities, where any part of such picketing is accompanied by slander, libel, or the public display or publication of oral or written misrepresentations
 
 
 [107]
 615 F.Supp. at 953
 
 
 [108]
 See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)
 
 
 [109]
 V.T.C.A. Penal Code Sec. 6.02(c)
 
 
 [110]
 D'Andrea v. Adams, 626 F.2d 469 (5th Cir.1980), cert. denied, Adams v. D'Andrea, 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981). See also Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976)
 
 
 [111]
 NAACP v. Claiborne Hardware Co., 458 U.S. 886, 928, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215, 1245 (1982)
 
 
 [112]
 New York Times v. Sullivan, 376 U.S. 967, 84 S.Ct. 1130, 12 L.Ed.2d 83 (1964)
 
 
 [113]
 See Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)
 
 
 [114]
 We express no opinion as to the constitutionality of criminal libel laws where the individual speaker must face the penalty. See Garrison, supra n. 113 Here all strikers are penalized for the misrepresentations of one
 
 
 [115]
 Article 5154f provides:
 
 
 [1]
 It shall be unlawful for any persons or association of persons, or any labor union, incorporated or unincorporated, or the members or agents thereof, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott, as those terms are defined herein
 
 
 [2]
 As used in this Act:
 b. "Secondary strike" shall mean a temporary stoppage of work by the concerted action of two or more employees of an employer where no labor dispute exists between the employer and such employees, and where such temporary stoppage results from a labor dispute to which such two or more employees are not parties.
 d. The term "secondary picketing" shall mean the act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees.
 e. The term "secondary boycott" shall include any combination, plan, agreement or compact entered into or any concerted action by two or more persons to cause injury or damage to any person, firm or corporation for whom they are not employees, by
 (1) Withholding patronage, labor or other beneficial business intercourse from such person, firm or corporation; or
 (2) Picketing such person, firm or corporation; or
 (3) Refusing to handle, install, use or work on the equipment or supplies of such person, firm or corporation; or
 (4) Instigating or fomenting a strike against such person, firm or corporation; or
 (5) Interfering with or attempting to prevent the free flow of commerce; or
 (6) By any other means causing or attempting to cause an employer with whom they have a labor dispute to inflict any damage or injury to an employer who is not a party to such labor dispute.
 
 
 [116]
 148 Tex. 42, 219 S.W.2d 787 (1949)
 
 
 [117]
 148 Tex. 434, 225 S.W.2d 958 (1950)
 
 
 [118]
 219 S.W.2d at 792
 
 
 [119]
 The injunction was sustained on the ground that the picketing had as its unlawful purpose to cause a violation of article 5207a. Article 5207a prohibits, inter alia, employment discrimination based on union membership
 
 
 [120]
 225 S.W.2d at 961
 
 
 [121]
 Id
 
 
 [122]
 American Federation of Labor v. Swing, 312 U.S. 321, 326, 61 S.Ct. 568, 570, 85 L.Ed. 855, 857 (1941); see also Cafeteria Employees Union, Local 302 v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58 (1943)
 
 
 [123]
 Texas courts have demonstrated an intent to construe labor statutes in accordance with the dictates of the NLRA. Texas State Optical v. Optical Workers Local 24859, 257 S.W.2d 493 (Tex.Civ.App.--Beaumont 1953, writ ref'd. n.r.e.); Motion Pictures Machine Operators Local 330 v. Pippin, 367 S.W.2d 383 (Tex.Civ.App.--Ft. Worth 1963, writ ref'd. n.r.e.). Our interpretation is consistent with the NLRA, as that Act has been interpreted by the NLRB and the courts. See Texas State Optical, supra. See also Linbeck Construction Corp. v. NLRB, 550 F.2d 311 (5th Cir.1977); Moore Dry Dock, 92 NLRB 549 (1950); Teamsters Union (C.R. Sheaffer & Sons), 136 NLRB 729 (1962)
 
 
 [124]
 354 U.S. 284, 293, 77 S.Ct. 1166, 1170, 1 L.Ed.2d 1347
 
 
 [125]
 Thornhill v. Alabama, supra, n. 79
 
 
 [126]
 For example, urging an employer to hire only union employees or urging an employer not to sell to nonunion sales people. See International Brotherhood of Teamsters v. Vogt, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957)
 
 
 [127]
 Medrano, 347 F.Supp. at 628
 
 
 [128]
 See n. 5, supra
 
 
 [129]
 Local Union No. 10, United Assn. of Journeymen Plumbers & Steamfitters v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946 (1953)
 
 
 [130]
 NLRB v. International Association of Bridge, Structural and Ornamental Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978)
 
 
 [131]
 Flenoy v. Yarbrough, 318 S.W.2d 15, 17 (Tex.Civ.App.--Austin 1958, writ ref'd. n.r.e.)
 
 
 [132]
 See American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941)
 
 
 [133]
 615 F.Supp. at 955-56
 
 
 [134]
 Thomas v. Collins, 323 U.S. 516, 534, 65 S.Ct. 315, 324, 89 L.Ed. 430, 442 (1945); Orr v. Thorpe, 427 F.2d 1129, 1131 (5th Cir.1970)